<hr />

## THE STATE, Respondent, vs. HAM, Appellant.

1. A reservation from sale, by the act of congress, of March 3, 1811, of land claimed before the board of commissioners, was not a disposition of the land, within the meaning of the first clause of the sixth section of the act of March 6, 1820, so as to prevent the same, when designated as a sixteenth section, from passing to the state for the use of schools.

2. The act of March 6, 1820, the ordinance of July 19, 1820, declaring the assent of the people of Missouri to the conditions contained in said act, and the designation of a sixteenth section, vest in the state, for the use of schools, a complete title to land so designated, unless the title had previously passed out of the United States.

3. So, the title of the state, to land designated as a sixteenth section, is superior to a subsequent confirmation, by special act of congress, of a Spanish claim, notice of which had been duly filed with the recorder of land titles ; especially when the confirmation professes to be nothing more than a relinquishment of the title remaining in the United States.

*Appeal from St. François Circuit Court.*

The appellant was indicted in November, 1851, under the thirtieth section of the act entitled " an act to regulate the sale of the sixteenth sections," (R. C. 1845, p. 994,) and the thirty-first section of the ninth article of the act concerning crimes and punishments, (R. C. 1845,) for trespassing upon section sixteen of congressional township thirty-four, range seven east, claimed as school land belonging to the inhabitants of said township. The indictment contained two counts. The first count charged the defendant with cutting down and destroying trees and crops. The second count charged him with cutting timber and quarrying rock. Plea, " not guilty."

At the trial, the state offered in evidence a survey of the sixteenth section by the county surveyor, made in the cause by order of the court. It was proved that the defendant had cut timber on the land included in said survey, within the time laid in the indictment. No other survey of the sixteenth section was given in evidence.

The defendant, in justification, exhibited the following evidences of title in Thomas Fleming, whose tenant he was admitted to be :

1. A petition, dated Ste. Genevieve, October 15, 1800, from Jean Bte. Vallé, Francis Vallé, St. Gemme Beauvais, and J. Bte. Pratte, to Don Carlos Dehault Delassus, lieutenant governor of Upper Louisiana, praying for a grant of two leagues square of land adjoining the Mine la Motte lead mine, owned and worked by them, to enable them to procure the timber and materials necessary to carry on the mine.

2. The reply of the lieutenant governor, dated January 22, 1801, stating that it was out of his power to make a grant of

the extent prayed for, referring the petitioners to the intendant general at New Orleans, and granting them temporary permission to cut wood on the land.

3. A power of attorney from the petitioners to Don Jacques Maxwell, dated March 9, 1802, to ask for a concession from the intendant general in their names.

4. A letter from Maxwell to the intendant general, dated New Orleans, April 29, 1802, asking a concession, as prayed for in the petition to the lieutenant governor, upon which was endorsed the following order, signed by Morales, the intendant, and dated November 30, 1802 : " Let the documents presented be accompanied by a translation thereof in the Castilian language, by the interpreter, Don Pedro Derbigny, and when this is done, let the same be seen by the fiscal agent."

5. Plat of a survey by Nathaniel Cook, deputy surveyor of the district of Ste. Genevieve, of 28,224 arpens, or 24,142 acres, including Mine la Motte, certified under date of February 22, 1806, as surveyed for J. Bte. and Francis Vallé, Beauvais and Pratte, " by virtue of a concession granted them by Don Carlos Dehault Delassus, bearing date January 22, 1801."

All the foregoing documents were filed in the office of the United States recorder of land titles, in February, 1806, by the Vallés, Pratte and Beauvais, as the foundation of their claim to a confirmation.

6. Proceedings of the first board of commissioners upon the claim of J. B. & F. Vallé, Pratte and Beauvais, for a confirmation of two leagues square at Mine la Motte. The board rejected the claim December 27, 1811.

7. An act of congress, approved May 24, 1828, entitled " An act confirming to Francis Vallé, Jean Bte. Vallé, Jean Bte. Pratte and St. James Beauvais, or to their heirs or legal representatives, of the county of Madison, in the state of Missouri, certain lands."

8. Official survey No. 2963, of the Mine la Motte tract, confirmed by the act of May 24, 1828.

9. A patent pursuant to the act from the United States to the legal representatives of the original proprietors, for the land embraced in survey 2963, saving the rights of third parties, in the words of the act. The patent was dated March 25, 1839.

10. All the title of the patentees of the Mine la Motte tract was admitted to be in Thomas Fleming, and the sixteenth section upon which the trespass was committed, was admitted to be within the lines of survey No. 2963.

The court below, at the instance of the state, gave the following instructions, to which the defendant excepted :

1. The act of congress of March 6th, 1820, entitled " An act to authorize the people of the Missouri territory to form a constitution and state government, &c., taken in connection with an ordinance declaring the assent thereto of the people of the state of Missouri, by their representatives in convention assembled, passed on the 19th of July, 1820, operated as a grant by congress to the state of Missouri, for the use of schools, of the sixteenth section in controversy, unless such sixteenth section had been previously disposed of by government.

2. Although the land claimed by the proprietors of Mine la Motte, by the several acts of congress in that behalf, was reserved from sale by the government, and although the survey of said claim includes and covers the sixteenth section in controversy, yet such reservation is not such a disposition of said section by the government, within the saving clause of said act, and cannot operate to prevent the title vesting in the state, by virtue of said grant.

3. And if the jury believe from the evidence, that the defendant was cultivating any part of the section, as described in the indictment, or committed any waste or injury to the said land, within one year from the finding of the said indictment, they must find him guilty, and assess a fine not exceeding five hundred dollars.

The following, among other instructions asked by the defendant, was refused :

" If the jury believe that the defendant went into possession of the land in question, under a lease from Fleming, believing that Fleming had a good title, and that he occupied the land in good faith, then he was not a trespasser, subject to be indicted."

The defendant was found guilty, and his fine assessed at four hundred dollars.   He filed his motions for a new trial and in arrest of judgment, which being overruled, he appealed to this court.   The cause was argued in this court at the October term, 1852, and an opinion filed at the March term, 1853. At the same term, a motion for a rehearing was filed, which was held under advisement until the March term, 1854, when the motion was overruled, and the opinion which is published was filed.   The following abstract of points, made by the appellant's counsel, includes those made in the motion for a rehearing, as well as on the original argument.

*Thomas T. Gantt,* for appellant.  1. The ground embraced within the lines of the survey made by Cook, which was filed with the recorder as evidence of the extent of the claim of Vallé and others before the old board, was by the acts of March 3, 1811, and February 17, 1818, reserved from sale or other disposition, until the final action of congress on the claim.   This final action was had in May, 1828, when the land was granted to Vallé and others.   The title then granted had relation to March 3, 1811, and defeated all titles having inception in the interval.   2. The act of March 6, 1820, contained no words of present grant.   Before a complete title could vest in the state, it was necessary at least that there should be a survey designating the sixteenth section, and the record does not show that any such survey has ever been made by the United States.   While the title of the state was thus incomplete, a complete grant was made to the lessors of the appellant. *Barry* v. *Gamble,* 8 Mo. Rep. 88.   3. It is not questioned that

State *v.* Ham.

congress had *power* to dispose of, by grant or otherwise, land which had been reserved by the acts of 1811 and 1818, but it is denied that they have, by the language of the act of March 6, 1820, manifested any *intention* to do so.   An intention to grant land reserved to satisfy a private claim, in open disregard of the reservation, and *in violation of recognized right*, ought not to be imputed to congress, unless such land clearly comes within the terms of the act, which it does not, because,

4. There was no authority by law for the survey by the surveyor general of the land claimed by Vallé and others, by sectional and township lines.   The first section of the act of congress of April 29, 1816, (2 U. S. S. at large, p. 325,) directs that officer to survey the public lands, and *also* to survey the lands claimed by private claimants, and then *or thereafter* confirmed, and transmit plats to the commissioner of the general land office.   The surveyor had no authority to survey private claims, whether confirmed or not, by township and sectional lines, and so there could be no legal designation of a sixteenth section within the survey made by Cook.   The act of March 6, 1820, should only be taken to refer to a sixteenth section which has a *legal* existence.   Besides this, the words " otherwise disposed of," in the act itself are sufficient to protect land reserved to satisfy private claims from the operation of the act.   It will scarcely be contended but that, if the *locus* of the sixteenth section, in any township, had been at the date of the act, reserved for military purposes, the schools would have been put to their election of equivalent lands " elsewhere ; and yet, if a reservation for any purpose protected the land from the operation of the act, it is difficult to deny that effect to the reservation created by the acts of 1811 and 1818.   By the reservation the land was " disposed of"—it was set apart to the satisfaction of a private claim.   It is an argument in favor of this construction that it satisfies, on the part of the government of the United States, every demand of the strictest good faith towards the state of Missouri, and also towards the private claimant.   The act gives to the schools land of equal

value, if the sixteenth section has been otherwise appropriated. But if the land of the private claimant is taken for the schools, he has no remedy. The case of *Hammond* v. *The Schools*, (8 Mo. 65,) has been referred to, as showing that a reservation to the use of schools by the act of 1812, did not prevent congress from granting the land reserved. It is submitted that the confirmation, in 1816, was evidence that the land was rightfully claimed by an individual, and so *not reserved* by the act of 1812, which only reserved lands not rightfully claimed by individuals. 5. The court erred in refusing to instruct the jury that if the defendant entered upon the land in good faith, under a grant from congress, he was not liable to a criminal prosecution. 6. The judgment should have been arrested for the insufficiency of the indictment. Upon the whole case, the following authorities are cited : Acts of Congress of March 3, 1811, April 29, 1816, February 17, 1818, March 3, 1819, March 6, 1820, and May 25, 1828. *Delassus* v. *The United States*, 9 Pet. 130. *Mackay* v. *Dillon*, 4 Howard, 420. *Bissell* v. *Penrose*, 8 Howard, 317. *Delauriere* v. *Emerson*, 15 Howard, 525. *McCabe* v. *Worthington*, 15 Howard. *Foley* v. *Harrison*, 15 Howard, 447.

*J. R. Lackland*, for the state. There is no evidence shown by the record that the parties under whom defendant claims ever acquired any title from the Spanish government. Their title only dates back to May 24, 1828, before which time, the United States had parted with the title by virtue of the act of March 6, 1820, and the ordinance of the state of Missouri of July 19, 1820, accepting the propositions contained in said act. In *Delauriere* v. *Emerson*, 14 Mo. Rep. 37, it was held that the title of the state, under the second subdivision of the act of March 6, 1820, was superior to a confirmation of a complete Spanish grant, by the act of July 4, 1836. The state here claims under the first subdivision of the same section. Admitting, therefore, that the defendant here has shown as good a title as that of Delauriere, the title of the state must prevail. Supposing that those under whom defendant claims had

such an inchoate title as that the land was reserved from sale by the acts of March 3, 1811, and February 17, 1818, still this did not divest congress of the power to make a different disposition of the land, as they did by the act of 1820. *Burgess* v. *Gray*, 15 Mo. Rep. 223. *Hammond* v. *The Schools*, 8 Mo. 74-5. *Waller & Smith* v. *Von Phul*, 14 Mo. Rep. 87. A mere reservation of the land from sale was not " a sale or other disposition" of it, so as to except it from the operation of the act of March 6, 1820. The act of May 24, 1828, under which defendant claims, contains conditions and reservations similar to those contained in the second section of the act of July 4, 1836.

GAMBLE, Judge, delivered the opinion of the court.

As the appellant, upon an application for a rehearing, has made some points which were not alluded to in the original opinion, it has been thought advisable to remodel the opinion so as to embrace those points, rather than have a separate opinion upon the motion for a rehearing published.

The case presents a conflict between a title in the state, for the benefit of the inhabitants of township thirty-four, range seven east, and a title set up under a private act of congress, passed on the 24th of May, 1828, confirming to François Vallé and others, the Mine la Motte tract of two leagues square. The land in dispute is the sixteenth section, and is comprehended in the survey of the claim of Vallé and others.

The sixth section of the act of congress of the 6th March, 1820, proposed to the convention which was to assemble for the purpose of forming a constitution for the state of Missouri, the terms of a compact to be entered into between the United States and the state of Missouri, declaring that the propositions, if accepted, should be obligatory upon the United States. The first proposition is in these words : " that section number sixteen, in every township, and when such section has been sold or otherwise disposed of, other lands equivalent there-

to, and as contiguous as may be, shall be granted to the state, for the use of the inhabitants of such township, for the use of schools." The condition upon which the government of the United States was to be bound by the propositions made in the act of congress was, that the convention should provide by an irrevocable ordinance, that land sold by the United States after the 1st January, 1821, should be exempt from taxation for five years after the sale, and that land granted as bounty land, for military services during the war with England, should, while owned by the patentees or their heirs, be exempt from taxation for three years from the date of the patents.

The propositions thus made were accepted by the state, and an ordinance was passed on the 19th July, 1820, declaring the assent of the state to the condition prescribed in the act of congress. These acts constitute the title relied upon by the state in the present case.

The defendant gave in evidence a transcript from the office of the recorder of land titles, by which it appeared that J. B. Vallé, Francis Vallé and others filed a claim with the recorder for two leagues square of land, and that the claim was founded upon a petition to the lieutenant governor for a concession, a recommendation of the petition by the lieutenant governor to the intendant general, and a provisional permission by the lieutenant governor to cut timber on the land for the use of their mines. There was also filed a survey of the claim, made in the year 1806. This claim was rejected by the board of commissioners in 1811. It was confirmed by private act of the 24th May, 1828, according to the survey made in 1806, but with a proviso in these words : " That this confirmation shall extend only to a relinquishment of title on the part of the United States, nor prejudice the rights of third persons, nor any title heretofore derived from the United States, either by purchase or donation." It was admitted that the title under this confirmation was in one Fleming, and that the defendant, Ham, claimed and occupied as his tenant.

It appears to have been assumed throughout the trial of the

case, that the United States survey of the district into townships and sections, had been made before the confirmation to Vallé and others, as no question was made in relation to such survey. The land is spoken of through the whole record as the sixteenth section, which, with us, is a designation only applied to land surveyed into sections by the United States, and such survey would not have been made after the confirmation.

Unless this sixteenth section had been "sold or otherwise disposed of," at the time the state of Missouri acceded to the terms of the compact proposed in the act of 6th March, 1820, the title to it became vested in the state, as soon as it was designated as a sixteenth section, if the language of that act was sufficient to transfer the title. The state, by the compact, became a purchaser of the land, although it was for the benefit of the inhabitants of the township ; and the consideration she paid was the relinquishment of her right to tax lands within her limits, sold by the United States, for five years after such sale, by which the value of the lands of the United States was enhanced. Now, the chief objection made to the title of the state is, not that the United States had sold the land to any person, nor that the title had been, in any other manner, or for any other consideration, passed to any third party, at the date of the compact between the United States and the state of Missouri ; but that, at that period, it had been, under acts of congress, reserved from sale, and was, therefore, "disposed of" within the meaning of the exception in the compact.

It cannot be doubted that it was competent for the United States to convey the title to the land which had been reserved from sale. This court, in *Hammond* v. *The Public Schools*, 8 Mo. Rep. 74, held, that the reservation of the lots mentioned in the second section of the act of congress of 13th June, 1812, for the use of schools in the several towns named in the act, did not prevent the congress of the United States from passing the title to one of such lots to an individual. That reservation, by its terms, was a permanent reservation. The reservation insisted on in the present case, is claimed under

the proviso to the tenth section of the act of 3d March, 1811, and was only a reservation from sale, of land claimed before the board of commissioners," until the final action of congress thereon." It conferred no right; it acknowledged no right. It imposed no obligation upon the government. It was simply a direction to its officers to refrain from selling land covered by claims, which had been filed according to law for adjudication. A sale by the executive officers of the government, contrary to the reservation, would be, if not protected by subsequent legislation, merely void. *Stoddard* v. *Chambers*, 2 Howard's Rep. 313. *Mills* v. *Stoddard*, 8 Howard's Rep. 345. *Bissell* v. *Penrose*, ib. 317. But the title to the land being still in the United States, could be passed by the government to any person, for any consideration, notwithstanding the reservation.

We are brought to the examination of the terms of the compact, to see whether, upon a reasonable construction, they embrace the land in controversy and pass the title thereto to the state.

It has been objected to the title set up by the state, that the words employed in the proposition by congress do not profess to transmit the title by their own force, but look to some act which is to have that effect. They are " section sixteen in every township *shall be granted.*" It is to be remembered that the proposition was made in an act passed March 6, and was to be accepted or rejected by the convention which was to assemble in June following, and therefore the proposition could not be otherwise expressed than in language looking to the future. When the state of Missouri subsequently expressed its consent to the terms proposed, and passed the ordinance exempting the land sold by the United States, and that granted for bounties to soldiers, from taxation, the compact was complete between the sovereignties, and no conveyance was needed to pass the title from the United States to the state, for any tract of land that then was or thereafter might be regularly designated as a sixteenth section. Such has been the action of

the two parties under the contract, as they framed it. No person ever heard of a patent from the United States to the state for a sixteenth section. The titles which have been acquired by individuals to sixteenth sections, sold under laws of the state, need no further grant from the United States to make them complete legal titles.

It is objected that, as this land was reserved from sale on account of the claim of Vallé and others filed with the recorder of land titles, there was no authority for surveying it into sections, and consequently there could be no legal designation of the tract in controversy as a sixteenth section, so as to allow it to be claimed by the state. In support of this position, reference is made to the act of April 29, 1816, (3 U. S. S. 325,) as requiring the surveyor to survey the lands embraced in private claims, thereby distinguishing them from the public lands, which he is required to survey under the direction of the president.

This act provides for the appointment of a surveyor of the lands of the United States in the territories of Illinois and Missouri, and makes it his duty to survey and divide so much of the lands of the United States as the president shall direct, in the manner in which the surveyor general is authorized and directed to do, in relation to the same or the lands lying northwest of the river Ohio ; and also to survey the lands in the said territories, the claims to which have been or may hereafter be confirmed by any act of congress.

The only authority in this act for the survey of a private claim is, after it has been confirmed, and it may as well be stated at once, that no act of congress ever authorized a public survey of any unconfirmed Spanish claim. The act of 28th February, 1806, (2 U. S. S. 352,) authorized the principal deputy surveyor to cause such surveys to be executed as he might be directed to execute, by the commissioners appointed to ascertain the titles and claims to lands in the territory, but the second proviso to the third section of the act expressly declares

that all such surveys, and all other surveys, except those of *legal and complete titles*, should be held and considered as private surveys only. The Supreme Court of the United States, in *Mackay* v. *Dillon*, 4 Howard, 447, declared the survey of the St. Louis commons, made in 1806, in the same year in which Vallé's claim was surveyed, to be only a private survey.

There was then no survey of the claim of Vallé and others, which the surveyor in Missouri could recognize; none which was binding upon the United States. When he contracted with his deputy for surveying a district in which this and other unconfirmed claims were located, the deputy must either survey the land included in such claims into sections and quarter sections, or he must run the exterior lines of the claims, and divide the adjoining lands into fractional sections and fractional quarter sections. No warrant is to be found, either in the laws or the practice of the government, for surveying the lands adjoining an unconfirmed claim into fractions. The lands included within such claims were still the lands of the United States. There are now a great many of such claims still unconfirmed. Many of them have never been bounded even by private surveys, and of those which have, the location of many is, doubtless, unknown to the surveyor by any evidence in his office. The practice of surveying the land covered by such claims into sections, instead of treating it as included in a public survey that would authorize the division of the adjacent land into fractions, was undoubtedly correct under the laws of the United States.

It is insisted that, although the reservation of the land included within Vallé's claim, did not divest the government of the title, and was not a "disposition" of the land, in the general sense of that term, still the compact ought to be so construed as to give to the state a right to equivalent land, and therefore leave the claim of Vallé and others unaffected. The proposition in the act of 1820 is, to grant the sixteenth section

in every township, " *and when such section has been sold or otherwise disposed of,*" other lands equivalent thereto. It is hard to find any warrant for such construction of the language here employed, as is insisted upon. It is the agreement of the parties that a particular section in each township shall be devoted to the use of schools, and one party is to take the title to that section for that purpose. It may be the best section in the township ; it may be the worst; but it is chiefly selected because it is central. The individuals to be benefitted by the grant are the inhabitants of the township, whose children are to be educated there by means of the grant. It is agreed between the parties that, if the United States had previously sold or otherwise disposed of that section, then the state should take equivalent lands, as contiguous as might be, for the use of the inhabitants of the township. This stipulation was not intended to reserve to the United States a right to sell or dispose of the sixteenth section in the future, and then to offer an equivalent in lands, but as there had been not only sales, but confirmations and donations of land, previously made in Missouri, this clause was to secure an equivalent for sixteenth sections, which might have been so disposed of. It is evident that there was present to the mind of congress, in framing the act of 1820, the idea that there were claims which had been confirmed, and other claims which would probably thereafter be confirmed ; for, in the second proposition made to the state and accepted, there is a grant of twelve salt springs, with six sections adjacent to each, to be selected by the legislature, but with the proviso " that no salt spring, the right whereof *now is, or hereafter shall be, confirmed or adjudged to any individual* or individuals, shall, by this section, be granted to the state." Here is a provision made, not only to secure those who already had confirmations for salt springs, from any interference by the state, but a right is reserved to confirm claims in the future, and if the state chooses to select any salt spring that is claimed by an individual, the title of the state will be

39—VOL. XIX.

divested by the confirmation of such claim. While this pro-
tection is afforded to unconfirmed claims to salt springs, no
such stipulation is made in relation to any unconfirmed claim to
a sixteenth section. No right is reserved to the United States
to confirm such claim in the future. As soon as there has
been a survey of land into townships, and a designation of
sixteenth sections, the only question of title is the question
whether the United States owns the land. If the title is in the
government, no subsequent act can affect the right of the state,
holding for the use of the inhabitants of the township.

The foregoing, it is believed, would be the law of this case,
if there had been an unconditional and unqualified confirma-
tion of the Spanish claim. But, in the present case, it is ap-
parent, on the face of the confirmation to Vallé and others,
that they can claim no otherwise than the United States could
claim this land, if there never had been a confirmation, and
the claim of Vallé and others had been annihilated. They hold
only a relinquishment of title from the United States, which it
is declared, "shall not prejudice any title heretofore derived
from the United States by purchase or donation." It can
scarcely be doubted that the state, holding for the inhabitants
of the township, is entitled to this land as against the United
States, and that title is older than the confirmation. If the
United States had so parted with, or affected the title to this
land prior to the confirmation, that it could not be reclaimed by
the government, then persons claiming under the confirmation,
which is but a mere relinquishment of title on the part of the
United States, without prejudice to any previous title by pur-
chase or donation, cannot claim it. In *Barry* v. *Gamble*, 3
Howard, 55, the clause in the second section of the act of the
24th May, 1828, (4 U. S. S. 298,) which is just like the pro-
viso in the special act in this case, is declared to have the effect
of giving a preference to the titles intended to be protected by
that clause, over the titles derived from the confirmations au-
thorized by the act. The title, then, of the state by the act

of 1820, and the designation of the sixteenth section, is, in our judgment, superior to the title set up under the confirmation to Vallé and others.

We have looked into the objections made to the indictment, on the motion in arrest of judgment, and think the motion properly overruled. The judgment is affirmed.