## HEMPSTEAD VS. THE AUDITOR.

The Swamp Land Agents, elected under the act approved 12th January, 1853, are entitled to their salary from the time fixed by law for their offices to go into operation, and their official duties to commence; which was upon their Districts being laid off by the commissioners, and the maps and plats of the lands in their respective Districts being furnished by the Auditor, and not from the date of their commissions.

*Appeal from the Circuit Court of Pulaski County.*

Hon. WILLIAM H. FEILD, Circuit Judge.

S. H. HEMPSTEAD, for the appellant.    1. That the appellant, having been elected Swamp Land Agent, given bond, taken the oath of office, and received a commission, was entitled to compensation from the date of his commission.

2. That the 6th section of the swamp land act does not deprive him of compensation: but merely increases his powers on receiving "books &c.," as therein provided.

3. That there is no such anomaly in our law as an officer without any right to compensation.

Mr. Attorny General CLENDENIN, for the Auditor.    The relator in this case was not entitled to a mandamus.    His duties as State Land Agent did not, and could not, commence until he was furnished with the books, maps, or plats of the Swamp Lands in his District.    See sec. 6 of the act entitled "An act amendatory of existing laws regulating the landed interests of this State," approved January 12th, 1853.

5B

And the existing laws of the State were not changed in regard to the office of Land Agent until he was furnished by the Auditor with the maps and plats. See section 38 of same act above referred to.

Mr. Chief Justice ENGLISH delivered the opinion of the Court.

On the 12th of December, 1853, Bernard F. Hempstead filed a petition for mandamus against the Auditor, in the Pulaski Circuit Court, alleging in substance, that he was elected, by the General Assembly, at the sesison of 1852–53, Land Agent, for the Washington District, under the provisions of the act of the 12th January, 1853, *"amendatory of existing laws regulating the landed interest of this State."* That, on the 14th of March, 1853, after his election, he took the official oath, and executed the bond, prescribed by the 5th section of said act; and, on the 17th of the same month, was duly commissioned by the Governor. Certified copies of the oath, bond and commission, are exhibited.

That he thus became one of the five Swamp Land Agents, elected and qualified under said act, and as such, entered upon the duties of his office, and from thence forward continued to act as such, and ever had been, and still was ready to discharge all the duties incumbent on him by virtue of said act, and claimed to be entitled to receive a salary and compensation, as such Swamp Land Agent, at the rate of eight hundred dollars per annum, payable in the manner specified in said act.

The petition continues as follows:

"Your petitioner further represents, that he procured a well bound book, wherein to enter each location or purchase of land; and in discharge of what he then, and still conceives to be his duty, sold swamp land, from time to time, as such Swamp Land Agent, and received Swamp Land Scrip or certificates therefor, and made report to the Auditor of Public Accounts, in accordance with the 16th section of said act, touching the operations of his office, for the year 1853, ending on the 30th day of June, 1853, whereby it was made manifest that 7,427.84 acres of 1st class,

2,847.63 of 2d class of swamp lands, had been sold, and entered at that office, and for which was received by your petitioner, properly assigned to the State, according to the law in that behalf provided, 14 Treasurer's Certificates, amounting to $1,851 54; 32 pieces of 1st class Swamp Land Scrip, for 160 acres each; and 17 pieces of 2d class Swamp Land Scrip for 160 acres each; and which scrip and certificates were cancelled according to law; all of which more fully appears, by a copy of the report of your petitioner, ending the 30th June, 1853, marked *Exhibit C.*, and prayed to be taken as part of this petition, the original having been returned to the petitioner, by the Auditor of Public Accounts, the said Auditor not considering the petitioner as Land Agent, until the maps and plats were furnished to your petitioner; and the Auditor also returned to him the land scrip sent with said report, and which was afterwards paid, and deposited with the Treasurer, as hereinafter shown: and which return will show the date of the purchase, by whom purchased, residence of the parties, section or part of section, township and range, the number of acres of swamp land of the 1st class and 2d class, and the locality thereof, in the Washington District, up to the 30th June, 1853, amounting, in dollars, up to the last mentioned time, to $6,651 54; and which swamp land certificates and scrip have been deposited and turned over to the State Treasurer, by your petitioner, in accordance with law; as well as scrip received the half year ending with the 31st December, 1853, without any reservation of salary, compensation, or fees; and that the petitioner has received nothing since his qualification as Swamp Land Agent, and entering upon the duties of his office, and which deposits and payments to the Treasurer will more fully appear by reference to the certificate of John H. Crease, Treasurer of Arkansas, dated 7th December, 1853, marked *Exhibit D.*, and prayed to be taken as part hereof."

"Your petitioner represents that the Auditor of Public Accounts, although requested, has refused, and still refuses, to make settlements with your petitioner, and draw his warrants on the

Treasurer, for the salary of your petitioner, quarterly or otherwise, howsoever, payable out of the lands sold, or the proceeds thereof, when in truth, and in fact, your petitioner, under the said law, is well and legally entitled to the same."

Prayer for writ of mandamus against Christopher C. Danley, as Auditor, &c., requiring him to audit the account of petitioner, as Swamp Land Agent, at Washington, for his salary, at the rate of $800 per annum, from the 17th of March to the 30th September, 1853, and to draw his warrant on the Treasurer therefor, or that he show cause, &c.

The court, on the presentation of the petition, ordered an alternative writ of mandamus to issue, to which the Auditor made the following response, in substance:

That he did refuse and still refuses, to make settlement with the petitioner as Swamp Land Agent, for the office at Washington, and to draw his warrant, as such Auditor, on the Treasurer, for the salary of petitioner as Swamp Land Agent, quarterly or otherwise, in manner as set forth in said writ, because respondent was advised that by the law of the land, the petitioner was not, on the said 30th day of September, 1853, in office as such Land Agent, and could not legally discharge any of the duties appertaining to his said office of Land Agent, and because the petitioner had not, on the said 30th day of September, 1853, been furnished with the *books, maps and plats* of the lands of the State, in the district of lands for which the said office at Washington was created, as required by law: and because Lambert J. Reardon was, on the 30th day of September, 1853, the Land Agent of this State, by virtue of law, having been elected such by the Legislature, and, as such, entitled to the salary of said office; and that if respondent were to obey the mandate of said writ, it would be a violation of the duties imposed upon him by law as such Auditor, and subject him to grievous losses and penalties; wherefore, &c.

The petitioner demurred to the response, on the following grounds.

1. That the said response places the right of the petitioner to compensation, on the fact of receiving the maps, plats, &c., whereas, by the law of the land his salary commenced from the 17th day of March, 1853, (the date of his commission.)

2. That by the law of the land, the said Lambert J. Reardon was not Land Agent of this State, after the said Swamp Land Agents were commissioned as such.

3. The respose is in other respects informal and insufficient, &c.

The Auditor joined in the demurrer: the Court adjudged the response to be sufficient, overruled the demurrer thereto, refused to order a peremptory mandamus, and the petitioner appealed to this Court.

The petitioner claimed his salary, as Swamp Land Agent for the Washington District, from the 17th of March (the date of his commission,) to the 30th September, 1853, the close of the current fiscal year of the State, down to which time he had not been furnished by the Auditor, with the maps, plats, &c., of the lands of the State embraced in his district: and the question presented for the decision of this court, is, whether the petitioner was entitled to his salary from the date of his commission, or from the time he was furnished with such maps, plats, &c.

The law under which he was elected, does not, in express terms, fix the time when the salaries of the Swamp Land Agents were to commence, and the question is one of construction, to be determined from the scope of that act, and other acts bearing upon the same subject matter.

By act of 20th December, 1844, a land office was established at Little Rock, to be held by an officer called the Land Agent for the State, to be elected by the General Assembly, commissioned by the Governor, to hold his office for two years, and until his successor was elected and qualified, and receive a salary of $500 out of the Internal Improvement fund. By this, and subsequent acts, it was made the duty of such Land Agent to sell, under prescribed regulations, the Internal Improvement and

Seminary lands previously donated to the State by Congress. *Digest, chap.* 97, *Art. II–III.*

This court judicially knows that Lambert J. Reardon was elected to this office at the successive sessions of 1844, 1846, 1848, 1850, and held the office at the time of the passage of the act of 12th January, 1853, *"amendatory of existing laws regulating the landed interest of the State."* 1 *Greenlf. Evidence*, sec. 6.

By act of January 6th, 1850, (*Pamph. Acts* 1850–51, *p.* 77,) the Governor was required to appoint three persons to act and be known as a board of Swamp Land Commissioners, whose term of office was fixed at two years, and until their successors were elected and qualified. By the same act, and a supplement thereto, approved 11th January, 1851, (*Pamph. Acts* 1850–51, *p.* 136,) it was made the duty of these commissioners to ascertain and report to the Governor, lists of the Swamp and Overflowed Lands, granted to the State, by act of Congress of 28th September, 1850; and he was required to file these lists in the office of the Surveyor General, &c. The board of Commissioners were also empowered to classify, fix the value of, and *sell these lands ;* and to contract for, and superintend the making of the levees and drains necessary to reclaim them, as contemplated by the act of Congress granting them to the State. Commissioners were accordingly appointed by the Governor, and entered upon the discharge of their duties.

Such, substantially, were the existing legal regulations when the Legislature assembled in November, 1852—the Land Agent of the State being empowered to sell the Internal Improvement and Seminary lands, and the board of Swamp Land Commissioners, to sell the Swamp and Overflowed Lands... At that session, the *"existing laws regulating the landed interest of the State,"* were amended, by an act of *forty-four sections,* approved 12th January, 1853, (*Pamph. Acts* 1852–3, *p.* 161,) the provisions of which, bearing on the question under consideration, are substantially as follows:

SECTION 1 declares that the entire landed interest of the State

shall thereafter be controlled and managed as thereinafter provided.

SEC. 2 requires the Auditor to procure, and keep in his office, a well bound set of books and correct plats, separately, of each class of lands belonging to the State; that is to say, of the "*Internal Improvement lands,*" the "*Seminary lands,* the *Saline lands,*" and the *Swamp and Overflowed lands,*" making four distinct classes.

SEC. 3 directs the Auditor to make out for each township in the State, embracing any of the above lands, *township maps,* upon which he should carefully class and discriminate the several kinds of lands aforesaid; and to *furnish* such *maps or plats* to the *Land Agents* of the *several Districts* thereinafter provided for.

SEC. 4. "There shall be established for the *sale* and *entry* of the lands of this State, as enumerated in *section two,* five offices, to wit : one at *Dardanelle,* one at *Jacksonport,* one at *Washington,* one at *Helena,* and one at *Pine Bluff.*"

SEC. 5. "The General Assembly shall, at its present session, and every two years thereafter, elect one competent person to fill each of the offices named in section four, who shall act and be known as Land Agent; and who shall keep his office at the point in the District for which he shall have been elected, designated in section four; and who, *before entering upon the discharge of his duties,* shall take an oath, &c., and shall enter into bond, &c., with security, to be approved by the Governor, in the sum, &c., conditioned," &c.

SEC. 6 provides "that *after* the said Land Agents *shall have been furnished* with the *books, maps or plats,* as hereinbefore provided for, they shall possess the like power and authority, be governed by the same rules and restrictions, and be guided by the same requirements of law, which *now control* the action of the State Land Agent in the *sale and disposition*" of the *Internal Improvement* and *Seminary lands*—and also empowers them to sell the Saline lands, if thereafter ordered to be sold, in the manner subsequently to be prescribed by law.

Sec. 7. "And the said Land Agents shall have full power, &c., to sell" the *Swamp and Overflowed lands*, "but in making such sales shall be governed by the rules, provisions and regulations now in force, and hereinafter provided, or which may exist, by law, at the time of such sale."

Sec. 8. provides, "that the said Land Agents, *upon receiving the maps and plats herein provided for*, shall immediately, and without delay, *proceed to advertise the Swamp and Overflowed land for sale*, taking the *books and maps furnished by the Auditor for their guides* with regard to what LANDS are *so owned by the State*." This section proceeds, also, to prescribe the mode and time of publishing the advertisement, fixes the place of sale at the office of the respective Land Agents, and then declares that on the day fixed for such sale, "they shall proceed to offer the said lands for sale to the highest bidder for cash, or Swamp Land Scrip: *Provided*, That no such lands shall be sold at such public sale for a less price than $1 25 per acre;" and that "such sales shall continue from day to day until all the Swamp and Overflowed lands shall have been sold, or offered for sale, by the respective Agents."

Sec. 9 requires the lands to be offered for sale by quarter and half quarter section.

Secs. 10 *and* 37, secure pre-emptions to actual settlers, provided they are proven up before the day of sale, and require the several Land Agents to notify them of their rights, under the act, in their advertisements; and *section* 11 allows pre-emptions to subsequent settlers upon the lands remaining unsold after the public sales.

Sec. 12 provides "that all lands not sold at the time appointed for such *public sale* shall be liable to be entered at any time thereafter, for swamp land scrip, &c., and the Land Agent shall give the purchaser a certificate of such entry, in which he shall specify the lands entered, and the amount received for such entry, and shall also *note* such *entry* on his *township maps*, and in his book to be kept for that purpose."

SEC. 20 requires the Auditor to furnish the several Land Agents with forms of entries, locations and certificates of entry, which forms the Agents are required to pursue in the disposal of the lands, and to discriminate the class to which the lands sold by them belonged.

SEC. 15 directs that "in addition to the memorandum of *sales* or *entry*, of lands to be made upon the *maps or plats* furnished by the Auditor, the several Land Agents shall each procure a well bound book, in which he shall enter each location or purchase of lands, specifying the tract sold, to whom sold, the date of the sale, the price, and how paid."

SEC. 16 makes it the duty of each of the Land Agents to make out a detailed report of the transactions of his office at the end of every six months, and transmit the same to the Auditor; and at the like periods to make settlements with the Auditor, and pay over to the Treasurer the amount of money and land scrip which may be found chargeable against him, and file the Treasurer's receipt for the same in the Auditor's office.

SEC. 14 provides "that each of the Land Agents herein provided for, shall receive, in full compensation for his salary, the sum of eight hundred dollars, to be paid equally out of the *different lands sold*, and in *porportion* to the amount of *each class* of the *lands controlled* by them."

SEC. 22 makes it the duty of the Auditor to prepare patents for all lands sold by the several Agents, after the same shall have been paid for, which patents, with other evidences of payment, are to be submitted to the Governor for his signature, and when signed by him, are to be recorded in the Auditor's office, &c.

SEC. 25 provides for the election, by the General Assembly, at its then present session, and every two years thereafter, of the board of Swamp Land Commissioners, &c.

SEC. 26 makes it the duty of the Swamp Land Commissioners, to divide the State into five convenient Districts, having as near as may be, the same quantity of swamp land in each, which Dis-

tricts were to be laid off with a view to the convenience of business from the offices of the five Land Agents, as located by the act.

Other sections of the act make it the duty of the board of Swamp Land Commissioners to carry forward the work of reclaiming the Swamp Lands, by the construction of levees, drains, &c.

SEC. 43 requires the expenses accruing on account of the several classes of lands, to be paid out of the fund arising from the sale thereof, respectively.

SEC. 38 is in these words: "That nothing in this act shall be construed so as to alter or change existing laws until the election and qualification of the officers herein provided for; *and until the Auditor shall make out and furnish* the several Land Agents herein provided for the several land Districts, with the *maps and plats*, as required to be furnished by him as aforesaid, which he shall furnish without delay."

These are the only provisions of the act bearing materially upon the question before us. Some of the sections have been transposed for the purpose of bringing them more immediately in connection with others relating to the same subject matter.

Prior to the passage of this act, as we have above stated, the Land Agent for the State, holding his office at Little Rock, was empowered to sell the Internal Improvement, and the Seminary lands; and the board of Swamp Land Commissioners, holding their office at such point in the State as they might designate (*Act of 11th Jan.*, 1851, *sec.* 3,) were authorized to sell the swamp lands (*Act of Jan. 6th*, 1851, *sec.* 8).

For greater public convenience, it may be supposed, the Legislature, by the act of 12th January, 1853, made provision for the division of the State into five districts (*sec.* 26,) and established a land office, to be held by an agent, in each of these districts (*sec.* 4). These agents were designed to act in the place of the Land Agent for the State, in the sale of the Internal Improvement and Seminary lands, and instead of the Board of Swamp

Land Commissioners in the sale of the swamp lands, lying in their respective districts (*sec.* 4, 6, 7, 8, 12). After the act went into full operation (*sec.* 38) the office of the Land Agent for the State, was to cease to exist, and the Board of Swamp Land Commissioners were to superintend the reclamation, and not the sale, of the Swamp Lands (*sec.* 25 *to* 44). It is manifest, from the scope of the act, that the five district land offices were created for no other purpose, than the *sale* of the lands of the State, and the five agents were charged with no other duties than such as were incident thereto.

When were these offices to go into active operation? When were the duties of these agents to commence?

The Auditor was made, as it were, the head of the Land Department of the State. He was required to procure and keep in his office, separate books and plats of all the several classes of lands belonging to the State (*sec.* 2). He was required to furnish *maps or plats* of these lands to the several agents (*section* 3); they were to note the sales and entries thereon (*sec.* 15); to make semi-annual reports of the transactions of their offices to him (*sec.* 16, 17, 18), and he was to prepare patents for the lands sold, submit them for the Governor's signature, and when obtained, record them in his office (*sec.* 22). Thus the books, plats, &c., kept in his office, were doubtless designed to constitute checks upon those kept in the offices of the agents to prevent errors and frauds. It is, therefore, manifest, that the agents could not commence the sale of these lands, or advertise them for sale, until such *maps* or *plats* were furnished them by the Auditor (*sec.* 3, 6, 7, 8, 12, 15, 20, 38); because they could not legally know what lands they were authorized to sell, or advertise for sale, until they were furnished with such *maps* or *plats.*

Before the Auditor could furnish such *maps* or *plats* to the agents, he had necessarily to procure correct lists of the lands, and cause duplicate plats to be made out, one copy for his own office, and one for the agents; and before he could deliver them to the agents, the Board of Swamp Land Commissioners had to divide

the State into districts (*sec.* 26), that the Auditor might know what townships were embraced in the district of each agent, and thereby be enabled to furnish him with *maps* or *plats* of such townships (*sec.* 3). This, it may be well supposed, was a labor of some magnitude, and, in order that the sales of the public lands might not be suspended, while the Auditor was preparing such plats, the Legislature deemed it expedient to continue in opera-iton the existing regulations for the sale of such lands, until such "*maps and plats were furnished to the several Agents,*" (*sec.* 38). Until such maps, &c., were furnished by the Auditor to the Agent for the Washington district, (the petitioner,) it would seem to have been clearly the intention of the Legislature, that the Land Agent for the State should continue to sell the Internal Improvement and Seminary lands; and the Board of Swamp Land Commissioners to sell the swamp lands, embraced within the limits of the Washington district, and so with the other districts. When such *maps*, &c., were furnished to the agent of any one of the districts, his power to sell the lands would commence, and the authority of the other officers would cease within his district. No other hypothesis will harmonize with all the provisions of the act.

The fact that the same General Assembly, which passed the act in question, elected Reardon, the Land Agent for the State, one of the Board of Swamp Land Commissioners, does not militate against the hypothesis above assumed, because both offices belonged to the Executive Department of the State, and the acceptance of the latter, did not necessarily vacate the former which it is but fair to presume the Legislature understood; and that they intended him to continue to discharge the duties of State Land Agent, until the district agencies went into operation and his office ceased to exist, may be inferred from the fact that they elected no other person in his place. The district agents were to succeed him in the powers and duties of his office, when they were *legally qualified* to do so, according to the provisions of the act in question.

The district land offices having been created for no other purpose than the sale of the public lands; and the agents charged with no duties except such as were incident to the making of such sales; inasmuch as they could not commence the discharge of these duties until their districts were laid off by the Board of Commissioners, and the requisite *maps* or *plats*, &c., were furnished to them by the Auditor, it follows that until then they had no official act to perform—their offices did not go into operation—though previously created, they were until that time, in an *inchoate* state.

The petitioner doubtless had the right to take the necessary oath, enter into bond, and, perhaps, to receive his commission from the Governor, at any time after his election, and thereby to place himself in an attitude of authority to receive from the Auditor the requisite *maps* or *plats*, &c., appertaining to his district in order that when they were ready for delivery, he might legally receive them, and enter upon the discharge of the duties of his office. If the Auditor had unnecessarily delayed the preparation or delivery of such *maps*, &c., the petitioner might, perhaps, have quickened the performance of his duty, by mandamus.

But was the petitioner entitled to the salary attached to the office, until the office went into operation—until he entered upon the discharge of its duties—until he had some labor to perform, and responsibility to incur? If it was any burthen or inconvenience to him to take the oath, enter into bond, and obtain his commission, there was no obligation upon him to take these preliminary steps, until he ascertained that his district was laid off, and the *maps*, &c., prepared for him. If he is entitled to his salary from the 17th of March, the date of his commission, as he supposes, he could as well have qualified, and obtained his commission, on the day after his election, in the previous January, and thereby, by his own act, entitled himself to his salary from that time, instead of from a later period. Had the office been in full being when he was commissioned, and had there been duties incident to it, which he might have been called upon presently to

perform, the commission would have placed him in an attitude of readiness to perform such duties, and, doubtless, his salary would have commenced from the date of his commission. But we have seen that until the *maps, &c.*, were furnished him by the Auditor, his office was in an *inchoate* state; there were no official duties for him to perform, and until then, other officers were authorized to continue in the exercise of the powers which were to attach to his office, when it went into operation.

The 14th section of the act provides that each of the Land Agents, &c., shall receive a salary of $800, "to be paid equally out of the different *lands sold*, and in *proportion* to the amount of *each class* of *lands controlled* by them."

The State holding each class of the lands in trust for particular public purposes, the Legislature doubtless designed to charge upon each class, the expenses incident to the sale, &c., thereof. (See, also, *section* 43).

The demurrer to the response of the Auditor, admits that to the 30th Sept., 1853, the *maps, &c.*, of the lands in the District of the petitioner had not been furnished to him; and the petition does not even show that the Board of Commissioners had laid off the Washington District; and this being an act to be done by them *in pais*, we cannot judicially know that it had been done.

When the petitioner demanded his salary, or the part claimed to be due, as alleged in his petition, if the Auditor had to look to the amount and class of lands *sold* by him, to determine upon what basis to audit it, as would seem to have been contemplated by sec. 14, the Auditor could not legally know that he had sold any lands, because the furnishing of the *maps or plats, &c.*, was to precede such sales. True, the petitioner alleges that after getting his commission, he procured a book, &c., proceeded to sell lands, &c., and report the transactions of his office to the Auditor. But how did he ascertain what lands of the State were embraced in his District, what remained unsold, and the class to which they belonged? The law under which he was elected, provided but one mode by which he was to be informed of the necessary facts

upon which to base the transactions of his office—this mode is plainly manifested upon the face of the statute—he was to look alone for such information to the official *maps or plats*, &c., which the Auditor was required to furnish him.   The law did not authorize him to go out, upon his own responsibility, and seek information from other sources.

If the Auditor, in auditing the salary of the petitioner, was not to be governed by the sales made by him, but might have looked alone to the "amount of each class of land controlled by him," the objection is still not removed, because there were no lands under the control of the petitioner, in contemplation of law, until such *maps or plats*, &c., were furnished to him.

The salaries of the officers of the State generally, are paid quarterly, (*Digest, chap.* 142, *sec.* 11), but it was perhaps the intention of the Legislature that the salaries of the Land Agents should be paid semi-annually, inasmuch as they are required by *section* 16, to make a report to, and settlement with the Auditor at the end of every six months, and pay over to the Treasurer the amount of money and land scrip "found chargeable against them;" and inasmuch as the Auditor, in auditing their salaries, would have to look to these reports, from time to time, to ascertain the quantity and class of the lands sold by them, and the proportions of the several classes of lands remaining under their control, as seems to have been contemplated by *section* 14.

However commendable may be the disposition manifested by the petitioner, to enter promptly upon the discharge of his official duties, after his election, we think he has clearly shown that he was in advance of the provisions of the law; and that he is not entitled to his salary from the date of his commission, but from the time fixed by law for his office to go into operation, and his official duties to commence.

The judgment of the court below is affirmed.