## HEMPSTEAD, LAND AGENT, VS. UNDERHILL'S HEIRS.

The provisions of the act of 20th January, 1855, conferring upon the swamp land agents the power to determine the validity of conflicting claims to the swamp lands, and to pass upon the validity of titles, upon application for patent certificates upon the surrender of the original certificates of purchase, is not unconstitutional and void—the power conferred being a ministerial and not a judicial power.

And, in the exercise of such power, the Land Agent was fully warranted in refusing to issue patent certificates for such parcels of land, purchased of the Commissioners, as had not been confirmed to the State, or were not subject to sale as swamp lands; or had been legally sold to other persons, though embraced in the original certificate of purchase issued by the Commissioners.

By the terms of the act of Congress granting the swamp and overflowed lands to the State, such lands as were embraced by the grant, vested in the State immediately on the passage of the act. It only remained to ascertain the particular lands included in the grant; and, when the lands are selected, the selections approved or confirmed, and the patent certificate issued to the State, her title to the particular lands, thus perfected, relates to the date of the act making the grant. (*Fletcher ad. vs. Pool, ante*)

By the act of the General Assembly, of the 6th January, 1851, the Commissioners were authorized to sell the lands selected, before they were confirmed and patented; and, upon a sale by them, whatever title the State had, passed to and vested in the purchaser; and if all or any of the lands had not been confirmed to the State at the time of the sale, the purchaser was entitled to the benefit of any subsequent confirmation that might be made.

The Land Agent was only required by the act of 1855, to issue patent certificates for the lands confirmed, and refunding certificates for those that were unconfirmed, but the purchaser was not bound to abandon the title purchased by him, and accept refunding certificates—he had the right to wait for the benefit of any future confirmations, or until confirmation was finally refused; and where the original certificate embraced both classes of land, the Land Agent might, as a matter of practice, though not required by the act to do so, have furnished a certificate showing the purchase, surrender of the certificate and right to patent certificates upon the confirmation.

The settler upon the swamp lands was allowed, by the act of 6th January, 1851, twelve months after the issuance of the patent to the State, to prove his right of pre-emption and enter the land; but the act of 12th January, 1853, limited the

338      CASES IN THE SUPREME COURT

Hempstead, Land Agent, vs. Underhill's Heirs.     [MAY

time, and required the proof and entry to be made before the day fixed by the Land Agent for the public sale of the lands, etc.

To an alternative mandamus to compel the Land Agent to issue patent certificates for swamp lands purchased of the Commissioners, he responded that prior to the application for the patent certificates, the lands had been entered by persons claiming them under the act of 6th January, 1851; which are alleged by the response to have been superior and paramount to the title purchased of the Commissioners; *Held*, on demurrer to the response, that it was sufficient; that if the petitioners for the mandamus desired to contest the truth of the statement in the response, that the pre-emption entries were superior and paramount to their title, they should have taken issue, or replied to the response, and that the response was sufficiently certain, there being no allegations in the petition and writ of mandamus requiring the Land Agent, in his response, to set out the material facts in relation to the pre-emptions.

A Land Agent had no power to sell swamp lands until his District was laid off by the Commissioners, and the maps and plats of the lands embraced thereby, furnished him by the Auditor (*Hempstead vs. The Auditor*, 16 *Ark.* 57); and so a sale by him to another person, before such maps and plats were furnished, was no excuse for refusing to issue a patent certificate to a purchaser from the Commissioners, whilst they were authorized to sell.

A Land Agent could not be required to issue a patent certificate, except upon the surrender of the original certificate of purchase.

Where a mandamus has been served by copy, and there is a variance between the writ and the copy, it may be corrected by proper application to the Court, and the defendant required to respond to the facts as stated in the petition and writ. But the proper mode of serving a writ of mandamus is by delivering the writ—the officer retaining a copy to make his return upon.

The Swamp Land Agent, being a mere executive officer, exercising ministerial and not judicial power in passing upon the validity of conflicting claims, his judgment may be controlled by mandamus; but neither the judgment of the officer in passing upon such claims, nor that of the Court, except incidentally, in the proceeding by mandamus, will affect the rights of other parties.

*Appeal from Hempstead Circuit Court.*

Hon. THOMAS HUBBARD, Circuit Judge.

S. H. HEMPSTEAD, for the appellant, made the following points:

A mandamus only lies against a public officer, where there is a plain legal right, and no other specific remedy 1 *Ark.* 16; 5 *Eng.* 416; 2 *Com. Rep.* 492; 3 *Texas*, 51. The relation or

petition must show the right of the relators, and also that there has been a refusal on the part of the officer to perform the specific act demanded. 12 *Ill.* 248; 11 *Humph.* 306; 15 *Barb.* 607.

The constitutionality of the act of 20th January, 1855, authorizing the Land Agent to determine the validity of conflicting claims, has been assailed. It might be sufficient to reply that the relators were seeking remedies and benefits under it. It is not merely a principle of universal law, but of immutable justice, that no one can claim benefits under a law, and then say it is unconstitutional and invalid. But we may go further. A law will never be declared invalid except in a clear case. The respect that is due from one co-ordinate branch of the government to another forbids it. 9 *Geo.* 253; 9 *Barb.* 482.

This act does not arm the Land Agent with judicial powers. And because he may administer oaths in some cases, for his own information, and to enable him to grant evidence of title to the right person, he does not become a judicial officer any more than the Auditor and Treasurer, each of whom has the power to administer oaths, touching the duties of their offices.

This law of 1855, was a very necessary and proper one. The chief design of it was to compare certificates that had been issued for swamp lands, with official records, and ascertain whether such lands had been confirmed, or unconfirmed; and if the latter, to enable the holders of the certificates to obtain the proper evidence on which they might have a return of scrip if they desire it.

This law destroys no vested right, and impairs the obligation of no contract. It may require an additional step to consummate the title, and to that extent change the previous remedy. But may not the Legislature, at any time, change the remedy as to past and existing contracts? Does not every new law, providing a new remedy, affect and operate upon causes of action existing at the time the law is passed? And yet such laws are perfectly valid. 7 *Peters,* 238; *Hemp. C. C. R.* 118. Who can doubt that a prior law, requiring titles to be made by

one officer of government, may be changed so as to require that to be done by a different officer, or in a different mode.

The relators might have traversed the return, if they deemed it untrue, and have had that issue tried by a jury. But having demurred, the facts stated in the return were admitted; and the only question arising upon it was one of law.

The return in this case, which must be taken as absolutely true, clearly shows that the Land Agent was fully justified in refusing to issue patent certificates to the relators in each case where they were denied; and if so, it will be impossible to sustain the judgment. But there is another view—if the return developes the fact that the lands are covered by outstanding titles in third persons, as it unquestionably does, then it follows that there is a contest about the title, which cannot be settled by mandamus; because those claimants are not parties to this proceeding. The conflict cannot be settled by mandamus; and to compel the Land Agent to make titles to these relators, would be unjust to those third persons who have valid titles, or at least, hold under color of title. And it can make no difference whether their equities are prior or subsequent. The court in this proceeding can go into no such inquiry. It would be a proper subject matter for equity cognizance, and where those persons could set up their titles.

PIKE, for the appellee—having argued this cause at length, upon the facts stated in the response to the writ:

By the act of 6th January, 1851, between the passage whereof, and that of 12th January, 1853, Underhill made all his contracts for doing levee work, in payment for which work he purchased these lands. The State proposed to him, in the most solemn form in which she could express and embody a proposition, a contract and a pledge of faith, that if he would contract with her Board of Commissioners to do, and would in accordance with the contract do, certain levee work, in order to reclaim the swamp lands given her by the United States, he should have the full right, either to receive in payment scrip,

to be issued by the Commissioners, representing quarter sections, at his option, or to take his pay by selecting swamp lands for himself, and furnishing the numbers of what he should so select, to the Commissioners.   On this right no limitation was imposed, except that he should locate his scrip upon, or select only such land as might remain *unsold—i. e.*, such as no other person should already have selected.

And then the State further proposed that, on his furnishing the Board of Commissioners with the numbers of the land so located or selected, they should give him a certificate thereof; and that, *upon that certificate*, the Governor *should* execute to him or his assignee, a deed for such land in due form of law. He had precisely the same right, in that respect, as was given to purchasers for cash, by section 8.

The act of 12th January, 1853, section 38, expressly provided, that nothing in that act contained should be so construed as to alter or change existing laws, until the election and qualification of the officers therein provided for, *and until* the several Land Agents should be furnished by the Auditor with the maps and plats of swamp lands in their district.

That was not the case with the Red River District, until late in December, 1853; until which time, this court has decided, the former law remained *pleno vigore*, and Mr. Hempstead was not an officer of the State.

The act of 1853, section 22, made it the duty of the Auditor to prepare patents for the Governor to sign, for all lands sold by the Land Agents: but no additional provision was made in regard to lands that had been or might be sold by the Commissioners, or taken in payment of work, by levee contractors or others; except that the Commissioners were required to report all such sales to the Auditor.

The utmost good faith is to be observed in the performance of contracts—*uberrima fides*—and the measure of the seller's performance is always to be the buyer's understanding of the former's affirmation or promise.   A State is held to as strict performance as an individual; for bad faith does not cease to

342      CASES IN THE SUPREME COURT

Hempstead, Land Agent, vs. Underhill's Heirs.     [MAY

be bad faith, when practiced by a State; nor is the privilege to perpetrate fraud one of the reserved rights of the States as sovereigns.

The State had, we say, agreed with Underhill, that if he would contract for and do levee work, he should take his pay in land; and having done so and obtained the Commissioners' certificate, the Governor should issue him patents. The Commissioners were to judge and decide as to his right to the land, and settle his accounts. From their decision no appeal lay to the Governor, or anywhere else. The duties of the Governor, in signing the patent, were merely ministerial; and when the Commissioners' certificate was produced to him, if it was gen uine, in due form, and sufficient on its face, the power to im-peach it did not reside in him. It could only be impeached before the courts.

When, in 1855, the Legislature undertook to require persons holding the Commissioners' certificates, to submit to an investigation before an official of the Executive Department, and to an adjudication by him as between their claims and those of others that might conflict with them, it undertook to add a new term to the contract, and destroy the effect of official acts of State officers, that by existing law were conclusive. Underhill had performed his contract. The Commissioners had accepted his work, settled his accounts, approved his purchases, and given him the certificates on which the State had solemnly agreed to issue him patents. All else to be done was merely ministerial. His right to patents was vested. The State undertook to annul his title, and to refuse him patents, unless he would get new certificates from another officer, and surrender those already held by him, and which she could not require him to surrender except on receiving patents.

Thus she impaired the obligation of her contracts, imposed on him new terms as conditions precedent to the enjoyment of an absolute vested right, delayed him in obtaining final title, undertook to bring him in conflict with others, and put him to additional costs and trouble. Argument is unnecessary to de-

monstrate that this was contrary to the Constitution of the United States.

If it should be said that, to require a purchaser of land, holding the Commissioners' certificate, to surrender that and procure the Land Agent's in its stead, before he should receive a patent, was a mere change of remedy, and within the power of the Legislature, the answer is obvious. Even that, if the Land Agents were required to issue his certificate as of course, would not have been a mere change of remedy. If before a party to whom the State had promised a patent on his producing the Commissioners' certificate, had obtained that certificate, the Legislature had required him to obtain a Land Agent's certificate instead; that would have been a change of remedy merely; because it would have been merely to substitute one officer in the place of another. It was a wholly different thing to require of him, after he had obtained the certificate required, to procure still another, *not* required by the contract, before he should have that contract performed. That was to add new terms and conditions to a contract already completely performed on one side. And, of course, it cannot be seriously pretended that the remedy only was intended to be affected, when the declared object was to enable the Land Agents to annul, in certain cases, the rights vested by the Commissioners' certificates.

The duties of the Commissioners, so far as such entries were concerned, were, simply, to ascertain that the State was indebted to the contractor for work done, to receive his application for land in payment, and, if it was swamp land, and there was no prior application, to certify that he had applied to purchase it and had paid for it. In the absence of any opposing pre-emption right, these powers were merely ministerial; and the act of 1851 made their action conclusive. As a ministerial officer, the Land Agent could not be invested with power to review them: and he could be clothed with no judicial power to impeach or reverse them.

Mr. Chief Justice ENGLISH delivered the opinion of the Court.

This is an appeal from the judgment of the Circuit Court of Hempstead county, awarding a peremptory mandamus against Bernard F. Hempstead, as Land Agent of the Washington District, to compel him to issue certain certificates of purchase of swamp lands, to the heirs of George W. Underhill, deceased, etc.

It appears that, on the 6th of October, 1853, the Swamp Land Commissioners issued to Underhill five patent certificates, each for a number of tracts of swamp land purchased by him with scrip, etc., issued to him as a levee contractor, under the *Act of 6th January*, 1851.

These certificates show, by their recitals, the times when Underhill filed lists of the lands embraced therein, in the office of the Secretary of the Board of Swamp Land Commissioners, and made applications to purchase them, and when his purchases were completed.

It also appears that on the 14th of December, 1853, the Secretary of the board issued to him a certificate for several tracts of land, containing 960 acres, purchased by him on that day.

That on the 13th of April, 1855, Underhill having departed this life, the above certificates were, on behalf of his heirs and administrators, presented to Hempstead, as land agent for the district in which the lands embraced in the certificates were situated, with a request that he issue to them, under the provisions of the *Act of 20th January*, 1855, patent certificates for such of the lands as had been confirmed to the State; and for such as were not confirmed, that he issue to them certificates, showing the purchase thereof by Underhill, so that the same might vest in them when confirmed, or that they might be paid therefor if not confirmed.

In the application to the land agent for such certificates, it was insisted, on the part of the applicants, that he should issue them, as a matter of course, in the exercise of a ministerial duty, and that so much of the *Act of 20th January*, 1855, as undertook to confer upon him power to determine the validity of conflicting claims to the lands, or to pass upon the validity of the titles of the applicants, was unconstitutional and void.

They also protested against his treating as conflicting claims, within the meaning of the act, entries alleged to have been made before him, before he was in office, etc., etc.

That the Land Agent objecting to the form in which the application was made, declined to take cognizance of it, expressing his readiness to act upon a proper application, and to grant to the representatives of Underhill such certificates as they might be entitled to, and as he had authority to issue under the act referred to, etc.

The heirs, etc., of Underhill, upon such refusal, applied to the Circuit Court of Hempstead county for a mandamus against Hempstead, to compel him to grant to them the certificates demanded by them, as above, etc.   An alternative writ was awarded, Hempstead responded thereto, a demurrer was sustained to the response, and a peremptory mandamus awarded, etc.

1. The respondent states that after the issuance of the alternative writ, the heirs of Underhill, at his request, filed in his office, the originals of the certificates, etc., recited in the writ, (except the one for 960 acres, dated 14th Dec. 1853,) and that in obedience to the writ, he issued to them patent certificates for all of the lands embraced in the certificates so filed, which appeared by the plats in his office to have been confirmed to the State, except for particular tracts which were specified. But that he had refused to issue certificates of purchase to them for the lands not appearing by the plats in his office to have been confirmed, as commanded by the writ, because he had no authority, under the act of 20th January, 1855, to issue such certificates. (A list of the unconfirmed lands is appended to the response.)   Respondent states, however, that he was willing and offered to issue to Underhill's heirs refunding certificates for the lands not confirmed, etc., etc.

The Court below decided that it would be within the spirit, though not within the letter of the act of *20th January*, 1855, for the Land Agent to issue certificates of purchase to Underhill's heirs for the unconfirmed lands in lieu of the original certifi-

22

cates filed in his office, that they might hold such evidence that their father had purchased the lands, until it was finally ascertained whether the lands were confirmed. That they were not bound to accept *refunding* certificates until the confirmation of the lands to the State was finally refused.

In order to determine whether the judgment of the Court below was correct or not, on this branch of the case, it is necessary to enquire what title Underhill purchased of the commissioners in the unconfirmed lands, and what were the powers and duties of the Land Agent under the act of 20th January, 1855.

By the terms of the act of Congress of the 28th *September*, 1850, granting the swamp and overflowed lands to the State, such lands as were embraced by the grant vested in the State immediately on the passage of the act. It only remained to ascertain the particular lands included in the grant, and when the lands are selected, the selections approved, or confirmed, and the patent issued to the State, her title to the particular lands, thus perfected, relates to the date of the act making the grant. *Fletcher adm'r et al. vs. Pool, ante.*

The practice under the act of Congress has been for the State to select such lands as were supposed to be within the grant, and when the lists of lands selected by her officers, and returned to the General Land Office of the United States, were approved by the Secretary of the Interior, the lands selected were said to be confirmed to the State. Such was the process of *ascertaining* what particular lands were embraced by the grant, carried on by the mutual consent of the two governments.

At the first session of the General Assembly after the passage of the act of Congress granting the lands to the State, an act was passed (*January 6th*, 1851,) making provision for the selection and reclamation of the lands by commissioners, and the Legislature treating the lands as belonging to the the State, authorized the commissioners to put them into market and sell them, without waiting for the selections made by

·them under the grant, to be confirmed by the Secretary of the Interior, and patented to the State.

Under the provisions of this act, Underhill purchased the lands in question, and obtained certificates of purchase from the commissioners, upon which, by the terms of the act, he was entitled to deeds from the Governor for the lands. (Sec. 5 and 6.) Whatever title the State had to the lands, at the time he so purchased them, passed to and vested in him, by his purchase. If, at the time he purchased, all or any of the lands purchased by him had not been confirmed to the State, he was entitled to the benefit of any subsequent confirmation that might be made. If part of the lands were still unconfirmed at the time his heirs demanded *patent* certificates therefor of the Land Agent, under the *act of 20th January*, 1855, they were not bound to abandon the title purchased by him, and accept of the agent *refunding* certificates, but they had the right to wait for the benefit of any future confirmations that might be made. They were under no compulsion to take *refunding* certificates until the lands were ascertained not to be within the grant, and their confirmation to the State finally refused.

But was it the duty of the Land Agent to issue to them any kind of certificates for the unconfirmed lands other than refunding certificates?

*Sec.* 1 of the *act of the 20th January*, 1855, provides, in substance, that all persons holding certificates for swamp lands issued by the commissioners, etc.; shall present them to the land agent of the proper district, for examination, and should the agent find, by examination of the records of his office, that the lands designated in the certificates so presented, have been confirmed to the State, as part of the grant of swamp lands, and that the proper number of acres had been paid for, and there is no conflicting claim thereto, he shall issue patent certificates to the holders of the surrendered certificates, their assignees or legal representatives, upon which the Governor shall execute deeds, etc., after the lands shall have been patented to the State, etc.

348 · CASES IN THE SUPREME COURT

Hempstead, Land Agent, vs. Underhill's Heirs. [MAY

*Section* 2 provides that, " should there be only part of the land embraced in such original certificate, confirmed to the State, the land agent shall issue a patent certificate for that which has been, or may have been, confirmed to the State, and shall grant to the holder of the orignal certificate a certificate to the auditor, designating the tract or tracts not confirmed, but embraced in such original certificate; and setting forth how much had been paid for such confirmed lands; and the auditor upon the presentation of such certificate of the land agent, shall issue a warrant to the owner thereof, for the amount so originally paid, and the amount of such warrant shall be paid, as in other cases, out of the swamp land fund."

Sec. 4 provides, " that original certificates taken up by the land agent, shall be returned to the auditor when they make settlements, and shall be examined by the auditor, and after adjusting the accounts of the land agents connected therewith, the original certificates shall be canceled and filed in the office of the State Treasurer." .

It will be observed that the act provides for the issuance of but two kinds of certificates in lieu of the surrendered certificates—*patent* certificates for confirmed lands, and *refunding* certificates for lands not confirmed.

At the time the heirs of Underhill presented to the Land Agent the certificates in question, part of the lands embraced therein had been confirmed, and others were unconfirmed, but it does not appear that the confirmation of any of them had been finally refused.

We have seen that the heirs were not bound to abandon their claim to the unconfirmed lands, and accept refunding certificates; and the Land Agent had no authority to issue the *patent certificates* for any but the confirmed lands. But in order to obtain patent certificates to such of the lands as were confirmed, they were required to surrender to the Land Agent the original certificates to be returned to the auditor and canceled.

Thus they were left without any evidence of their claim to the unconfirmed lands. This was the result of defective

legislation. But though the Land Agent was not expressly authorized or required so to do, by the act of 20th January, 1855, yet he might, as a matter of practice in his office, have furnished the heirs a certificate, upon their surrendering the original certificates, showing the purchase of the unconfirmed lands by their father, the surrender of the certificates issued to him, and their right to *patent* certificates, on the final confirmation, or refunding certificates on the *rejection* of the lands. But this question is now of but little importance, because the Legislature, by act of 17th February, 1859, (*Acts of* 1858, *p.* 178,) have supplied the deficiency in the previous legislation above indicated; and inasmuch as this case must be reversed on other points, the Land Agent may be required to conform to the practice established by the new acts, when the cause is remanded.

2d. The appellant further stated in his response to the alternative writ of mandamus, that four tracts of the land embraced in the original certificates filed in his office by the appellees, (south-east quarter and south-west quarter section 9; north-east quarter and east half south-east quarter section 15, township 13 south, range 31.) were, long prior to the passage of the act of Congress granting the swamp lands to the State, selected and confirmed as part of the 500,000 acres of land donated to the State by Congress, for internal improvement purposes. For which cause appellant refused to issue to appellees patent certificates for said lands, but offered to issue refunding certificates therefor.

The demurrer admitting this statement to be true, the Court erred in making the mandamus absolute as to these lands—as conceded by the counsel for the appellees, in his argument. The swamp land commissioners had no power to sell internal improvement lands.

3d. The appellant next proceeds, in his response, to designate several tracts of land embraced in the certificate filed by appellees, and confirmed to the State as swamp lands, but for which he refused to issue to them patent certificates,

**350**      CASES IN THE SUPREME COURT

Hempstead, Land Agent, vs. Underhill's Heirs.      | MAY

because the lands had been entered in his office by pre-emptions, etc. His statement as to these lands is as follows: "That the south-west quarter of south-west quarter, section 33, township 12 south, range 32 west, was applied for, and entered by virtue of his pre-emption right, on the 27th day of January, A. D., 1855, by one *Edward Fitzgerald*.

"That the west half of the north-west quarter, section 32, in Township 16 South, Range 25 west, was applied for and entered by virtue of his pre-emption right, on the 27th day of September, 1854, by one *John L. Howard*.

"That the west half of north-west quarter, and east half of north-east quarter of section 22, in township 13 south, range 32 west, was in like manner applied for and entered by virtue of his pre-emption right, on the 16th day of February, A. D. 1854, by *Henry A. Hawkins*. And this respondent does refuse to issue patent certificates for said lands, to said heirs, as the pre-emption right of said parties under the *13th section* of the *act of 6th of January*, 1851, is superior and paramount to that of any other person or persons to said lands."

It seems that Underhill purchased the tract entered by *Fitzgerald*, on the 1st March, 1853, and the tracts entered by *Howard* and *Hawkins*, on the 3d of January, of the same year. His purchases of the Commissioner being prior in time, were paramount, unless the entries with the Land Agent, by the persons claiming by pre-emption were prior in right.

*Section* 13, of the act of 6th January, 1851—(*the first swamp land act passed by the Legislature*,) declares that all persons legally entitled, by any act of Congress theretofore passed, etc., to right of pre emption on any of the swamp and overflowed lands; or who shall reside on, or who shall have improved the same, shall have the exclusive right of purchase thereof, to the extent of their claims, for the period of twelve months from and after the date of the patents issued by the United States to the State, at the price previously fixed upon the same, not to exceed $1 25 per acre.

By act of 12th January, 1853, five land agencis were estab-

lished for the sale, etc., of the swamp and other lands of the State. Each of the Land Agents was to be furnished by the Auditor, with maps and plats of the land in his district, etc.; upon receiving which, he was immediately and without delay, to proceed to advertise the swamp lands in his district for sale, by hand-bills, and by publication in two newspapers for *six weeks*, the last insertion to be at least thirty days before the day fixed for the sale, etc., (*sec.* 8.)

*Sec.* 10 of this act declares " that every head of a family, who may hereafter settle upon, *or who is now a settler upon any of the undisposed of swamp and overflowed lands*, shall have a pre-emption right thereto, in exclusion of all persons whatsoever, up to the day of such sale, and shall have a right to enter any of the legal subdivisions as above recited. *Provided*, that no right under this section shall vest in any individual, except an actual settler upon a portion of the lands claimed, or whose improvement may extend from his own lands to a portion of the swamp and overflowed lands. But if such settler fail to make such entry before the day set apart for such sale, then the right of entry shall be lost, and the lands offered for sale to the highest bidder; and it is hereby made the duty of the Land Agents in their advertisements to notify pre-emptors of their rights under this act."

The act of 6*th January*, 1851, allowed the settler twelve months after the issuance of the patent to the State, to prove his right of pre-emption and enter the land. The act of 12th January, 1853, limited the time, and required the proof and entry to be made before the day fixed by the Land Agent for the public sale of the lands, etc.

The response of the appellant shows that *Fitzgerald* made his entry on the 27th of January, 1855; *Howard* made his on the 27th of September, 1854; and *Hawkins* made his on the 16th of February, of the same year; but whether either of these entries was made before the day fixed by the appellant for the sale of the swamp lands in his district, under the act of 12th January, 1853, does not appear from the response.

352     CASES IN THE SUPREME COURT

Hempstead, Land Agent, vs. Underhill's Heirs.     [May

The petition for mandamus alleges that the appellant did not receive from the Auditor the maps and plats of the land in his *district*, until after the 14th December, 1853. (The date of Underhill's last purchase of the Commissioners.) Taking this allegation to be true, if he received the maps, etc., on the next day, and proceeded immediately to advertise the lands for sale, he could not have fixed the day of sale earlier than about the first of March, 1854, and given the notice thereof, required by the act of the 12th January, 1853. Hence, the entry made by *Hawkins*, on the 16th February, 1854, must have been prior to the day fixed for the sale.

Moreover, neither the petition, nor the mandamus, nor the response, states the time at which the appellant received the maps and plats appertaining to his office, or the day upon which he made his first public sale, under the act of 12th January, 1853, consequently we have nothing before us from which we can determine, with any legal certainty, nor had the court below, that the entries of *Fitzgerald* and *Howard* were not made before the day of sale, and within the period limited by the statute in question.

The petition for mandamus shows that the appellees made their application to the appellant for patent certificates for the lands in controversy, on the 13*th of April*, 1855.

The response shows that prior to that time, the lands had been entered by persons claiming pre-emptions thereon, under the *act of 6th January*, 1851, which are alleged by the response, to have been superior and paramount to the title purchased of the Commissioners by the father of the appellees.

Upon this state of pleadings, we think the court below erred in making the mandamus absolute as to these tracts of land, and ordering the appellant to disregard the entries made by the persons claiming by pre-emption, and to issue patent certificates to the appellees.

If the appellees desired to contest the truth of the statement in the response, that the pre-emption entries were superior and paramount to the title purchased by their father, they should

have taken issue, or replied to this portion of the response, and caused the necessary facts to be put upon the record, to enable the court to pass upon the validity of the conflicting claims, so far as to determine whether the appellant was under legal obligation to issue patent certificates for the lands, in favor of appellees. Though in this proceeding the rights of the persons; claiming the lands by pre-emption, and who were not before the Court, could not be affected further than they might be incidentally affected by the decision of legal questions touching the powers and duties of the Land Agent in the premises, which are the subjects of the controversy between the parties to this suit.

If it be supposed that the appellant should have set out in his response all the material facts in relation to these pre-emptions, as a matter of certainty, in pleading, it may be responded that the appellees in their application to him for patent certificates to the lands, and in their petition for mandamus, assume that so much of the act of 20th January, 1855, as authorized the appellant to enquire into the validity of conflicting claims, was unconstitutional and void, and there was nothing in the allegations of the petition, or form of the writ, which imposed upon the appellant the duty of setting out with more certainty than he did, the facts in relation to conflicting claims.

4th. The response further states that " The south-west of north-east quarter, and the north-west of south-east quarter of section 28, township 14 south, range 26 west, were, on the 10th day of May, 1853, entered by Richard H. Finn, before respondent, acting as Land Agent, and also under the authority of the Board of Swamp Land Commissioners. And he herewith exhibits copies of his commission as Land Agent, and said authority from said board, etc. And that James McDaniel, as the administrator of said Finn, did, on the 24th of March, 1855, present the certificates so issued to said Finn, by this respondent, and demand from him, as Land Agent, patent certificates on the same, and which this respondent accordingly issued, as he had no legal notice of any conflict of title." Wherefore he

**354**     CASES IN THE SUPREME COURT

Hempstead, Land Agent, vs. Underhill's Heirs          [MAY

refused to issue patent certificates for said lands to Underhill's heirs.

The commission of appellant, as Land Agent, is dated 7th March, 1853: but he was not in office, and had no power to sell swamp lands until his district was laid off by the Commissioners, and the maps and plats of the lands embraced thereby furnished him by the Auditor. *Hempstead vs. The Auditor*, 16 *Ark.* 57. , It is alleged in the petition for mandamus that the maps and plats were not furnished to him until after the 14th of December, 1853, which is not controverted. It follows that he had no legal authority, as Land Agent, to sell the lands in question to Finn, or any one else, on the 10th May, 1853.

It seems that on the 7th April, 1853, the Board of Swamp Land Commissioners made the following order: " Ordered by the Board, that all pre-emption proofs and papers, pertaining to the rights of parties claiming lands by pre-emption, or otherwise, on file in this office of the Board of Swamp Land Commissioners, be turned over to the Land Agent of the district to which they belong, to whom is intrusted the power and duty of receiving applications for swamp lands, and of adjusting the rights of pre-emption to same."

*By act of 6th January*, 1851, the Commissioners were empowered to sell the swamp lands. By *act of 12th January*, 1853, provision was made for transferring this power to the Land Agents. When the appellant received the maps and plats of the lands in his district, his authority to sell the lands commenced, and that of the Commissioners terminated, and not before. *Hempstead vs. The Auditor, ubi sup.*

If they had the right to make the appellant a deputy to sell lands for them, the above order does not purport to be such a deputation.

If they intended by the order to terminate the power vested in them by law, to sell the lands and transfer it to him as Land Agent, the order was ineffectual for that purpose. Notwithstanding the order, the power to sell the lands remained in them until he received the maps and plats belonging to his

office from the Auditor, when the law vested the power of sale in him.

It follows that the portion of the response under consideration was insufficient.

5. The response further states, " that Daniel E. Williams and James McDaniel, did, on the 20th day of May, 1855, present to respondent, a certificate, issued by W. E. Butts, as Secretary of the Board of Swamp Land Commissioners to them, dated *October 28th*, 1853, for the west half of the north-west quarter of section 8, township 14 south, range 26 west; and they demanded on such certificate a patent certificate from respondent for said land, which he issued on said 20th of May, having no official information that there was any conflicting claim to the same."

It appears that Underhill purchased this tract of land from the Commissioners, prior to the 28th October, 1853, the date of the certificate of purchase issued by the Secretary of the Board to Williams and McDaniel. The application to the appellant for a patent certificate for this land, on the part of Underhill's heirs, was made on the 13th April, 1855. Williams & McDaniel made their application, and obtained the certificate on the 20th May following. It would seem, therefore, that at the time he issued to them the certificate, he might have had official information that there was a conflicting claim to the land.

This portion of the response was, therefore, insufficient.

6. The response further states: " That Ezekiel Kinsworthy did, also, on the 7th June, 1855, present two certificates, issued by said W. E. Butts, as such Secretary of the Board of Commissioners, both bearing date the 12th day of February, 1853, calling for the north-east of the north-east quarter of section 27, the south-west of the south-west quarter of section 26, and the north-east of the north-east quarter of section 34, township 13, south, range 31 west; and, in like manner, demanded patent certificates for said lands, which respondent accordingly issued," etc.

It seems that Underhill did not purchase these lands until the 29th July, 1853, which was subsequent to the time they were purchased by Kinsworthy: and, as conceded by the counsel for appellees, he was entitled to the patent certificate.

It follows that as to these lands the response was sufficient, and the Court erred in making the mandamus absolute as to them.

6. The appellees claimed a patent certificate for a tract of land, described in the petition for mandamus, and in the writ, as the south-east quarter of the south-east fractional quarter of section 1, township 14 south, range 29 west, 25 34-100 acres; but in the copy of the writ served upon the appellant, and appended to his response, the tract is described as the south-east quarter of the south-east fractional half of section 1, etc.

The response, as to this tract, as copied in the transcript, is not intelligible. It is supposed, however, that respondent meant to say that there was no such legal subdivision of land, appearing upon the plats of his office, as the south-east quarter of the south-east fractional half of section one, etc., described in the copy of the writ served upon him.

The variance between the original writ and the copy, in the description of this tract, was doubtless a mere clerical error, which might have been cured by amendment upon a proper application to the Court, and the appellant required to respond as to the tract properly designated, etc.

It may be remarked, however, that the sheriff should have handed the original alternative writ of mandamus to the appellant, and made his return upon a copy, and the appellant should have appended his response to the original writ. Such is the proper practice.

8. The appellant further stated, in his response, that he refused to issue certificates of any kind to the appellees for the tracts of land, making 960 acres, embraced in the certificate issued to Underhill on the 14th December, 1853, by the Secre-

tary of the Board of Commissioners, because the appellees failed, upon request, to file the original certificate in his office, etc.

The writ of mandamus should have commanded the appellant to issue the new certificate upon the appellees filing the original certificates in his office. The law required the originals to be surrendered, and returned by the Land Agent to the Auditor to be canceled; and the new certificates could not legally be issued until the originals were surrendered.

The writ was defective in the matter above indicated.

9. Notwithstanding the conflicting entries which we have above considered, the Court below adjudged it to be the duty of the appellant to issue patent certificates to the appellees for all of the confirmed lands embraced in the certificates issued to their father by the Commissioners, treating as unconstitutional and void so much of the act of the 20th January, 1855, as empowers the Land Agent to pass upon the validity of conflicting claims, etc.

Section 1 provides that the Land Agent shall issue patent certificates in lieu of surrendered certificates, when there is no conflicting claim to the lands, etc.

Section 5 provides: " That when there are conflicting claims to such lands, the Land Agents may administer oaths, and shall, upon proper notice to the parties, and upon hearing testimony and statements under oath, decide to whom the patent certificate shall be issued, in accordance with the law on the subject, and shall issue the patent certificate accordingly; and should the other party, whose claim is not allowed, desire a certificate to the Auditor, upon which to have the amount paid by him upon the land, refunded, the Land Agent shall issue the necessary certificate to enable him to do so, upon his surrendering such original certificate to the Land Agent."

The Court below seems to have been under the impression that this provision of the act was an attempt to confer judicial power upon the Land Agents, and was, therefore, void. If the premises were correct, the conclusion would follow, as a con-

sequence, for the Land Agents, being executive officers, could not be clothed with judicial power under the constitution. But such, perhaps, was not the intention of the Legislature, and such cannot be the effect of the provision of the act in question. On the contrary, it merely confers upon the Land Agent ministerial power to enquire into the facts in relation to conflicting entries, and to give the patent certificate to the party appearing to be entitled to it by law. But his decision is not conclusive upon the rights of the parties. The party to whom he issues the patent certificate, may obtain the deed of the Governor for the land; but the party holding the conflicting certificate, is not bound to surrender it, and take a *refunding* certificate. He may stand upon his rights, notwithstanding the decision of the Land Agent against his claim, and when the deed is issued to the successful claimant, may file a bill in equity to divest his title, etc.

It seems that conflicting entries had been made before the Commissioners, perhaps many of them, and the Legislature thought proper, as a mere executive regulation in relation to the issuance of patents, to require all persons holding certificates of purchase to surrender them to the Land Agents, and take out new patent certificates, etc., for the purpose of having it determined, as far as it could be done by a ministerial officer, who were entitled to patents, etc. The act did not, and the Legislature could not, divest any right to lands, which Underhill or any other person purchased of the Commissioners, before its passage.

But the Land Agent being a mere executive officer, exercising ministerial and not judicial power, in passing upon the validity of conflicting claims, his judgment may be controlled by mandamus; but in this proceeding, as above remarked, the rights of other parties are not to be affected further than they are necessarily incidentally affected in determining the duties of the officer, etc.

It has been shown above, that the Court below should have

sustained the demurrer to portions of the response, and over-ruled it as to other portions.

The judgment is reversed, and the cause remanded for further proceedings.

Absent, Mr. Justice RECTOR.