The Hannibal and St. Joseph Railroad Company, Appellant, v. Lewis Smith, Respondent.

1. *Lands and Land Titles—Railroad Corporations—Evidence.*—Under the act of Congress of June 10, 1852, granting lands to the State of Missouri for the construction of the roads therein named, and the statute of the State of September 20, 1852, transferring such grant to the Hannibal and St. Joseph Railroad Company, no title to the *even* numbered sections within six miles of the road passed to the corporation until the plats of the location of the roads were filed in the office of the Secretary of State, and in the offices of the recorders of deeds in the counties in which the lands were located, as required by the statute of the State approved Sept. 20, 1852, § 7—see Baker v. Gee, 1 Wal. (U. S.) 338; Pacific R.R. v. Lindell's Heirs, 39 Mo. 329.—The act of Congress of June 10, 1852, made no provision for any kind of documentary evidence to be issued by the General Land Office, by which the location, boundaries and identity of the particular tracts granted within the six-mile limit were to be designated and proved; the public sectional surveys showing the even numbered sections within the six-mile limit, although admissible in evidence, are insufficient for that purpose. The certified list under the act of Congress of August 3, 1854, is evidence to show what lands passed by the grant; but if the lands embraced in such lists are not of the character contemplated by the act of Congress, or are not such as were intended to be granted thereby, then such certified lists can have no effect as evidence.

2. *Lands and Land Titles — Swamp Lands — Railroad Corporations—Evidence—Reservation.*—The act of Congress of September 28, 1850, " to enable the State of Arkansas and other States to reclaim the swamp lands within their limits," operated as a reservation upon the grant of lands made to the State of Missouri for the construction of the railroads described in the act of Congress of June 10, 1852; and in a suit of ejectment brought by the railroad corporation claiming title to lands under said act of June 10, 1852, parol evidence is admissible to prove that the land sued for was "swamp and overflowed lands, made thereby unfit for cultivation," so as to bring such land within the terms of the grant or reservation made by the act of September 28, 1850, although the lists and plats to be made by the Secretary of the In-

terior, provided for in said act, had not been made and transmitted to the Governor, nor patents issued. Such parol evidence is not admissible to prove title in defendant, but is admissible for the purpose of rebutting and invalidating the effect of the lists issued under the act of Congress of June 10, 1852, and August 3, 1854.

*Appeal from Macon Circuit Court.*

Ejectment for the N.W. $\frac{1}{4}$ of the N.W. $\frac{1}{4}$, and the E. $\frac{1}{2}$ of the N.W. $\frac{1}{4}$, and the N.E. $\frac{1}{4}$ of the S.W. $\frac{1}{4}$ of section 20, in township 58, and range 16, situate in Macon county in the State of Missouri. Entry laid October 2, 1855.

The respondent in his answer denied that appellant was entitled to the possession of said premises at the time alleged, or at any time since or prior thereto; and denied that he unlawfully withheld the possession thereof.

At the February term, 1866, the case was tried by the court sitting as a jury.

The appellant, to show title in itself, read in evidence—

*First.* An act of Congress entitled "An Act granting the right of way to the State of Missouri, and a portion of the Public Lands, to aid in the construction of certain Railroads in said State," approved June 10, 1852.

By the 1st section the right of way is "granted to the State of Missouri for the construction of railroads from the town of Hannibal to the town of St. Joseph in said State, and from the city of St. Louis to such point on the western boundary of said State as may be designated by the authority of said State"; "and a copy of the location of said roads, made under the direction of the Legislature, shall be forwarded to the proper local land offices respectively, and to the General Land Office at Washington City, within ninety days after the completion of the same, to be recorded."

" § 2. And be it further enacted, That there be, and is hereby granted to the State of Missouri, for the purpose of aiding in making the railroads aforesaid, every alternate section of land designated by *even* numbers, for six sections in width on each side of said road; but in case it shall appear

that the United States have, when the line or route of said roads or either of them shall be definitely fixed by the authority aforesaid, sold any section or any part thereof granted as aforesaid, or that the right of pre-emption has attached to the same, then it shall be lawful for any agent or agents to be appointed by the Governor of said State, to select, subject to the approval of the Secretary of the Interior, from the lands of the United States most contiguous to the tier of sections above specified, so much land in alternate sections or parts of sections as shall be equal to such lands as the United States have sold, or to which the right of pre-emption has attached as aforesaid; which lands, thus selected in lieu of those sold, and to which pre-emption rights have attached as aforesaid, together with the sections and parts of sections designated by even numbers as aforesaid, and appropriated as aforesaid, shall be held by the State of Missouri for the use and purpose aforesaid: Provided, that the lands to be so located shall in no case be further than fifteen miles from the line of the road in each case: Provided further, that the lands hereby granted shall be exclusively applied in the construction of that road for which it was granted and selected, and shall be disposed of only as the work progresses, and the same shall be applied to no other purpose whatsoever: And provided further, that any and all lands heretofore reserved to the United States by any act of Congress, or in any other manner by competent authority, for the purpose of aiding in any object of internal improvement, or for any other purpose whatsoever, be and the same are hereby reserved to the United States from the operation of this act, except so far as it may be found necessary to locate the route of the said railroads through such reserved lands, in which case the right of way only shall be granted."

"§ 4. And be it further enacted, That the said lands hereby granted to the said State shall be subject to the disposal of the Legislature thereof for the purposes aforesaid and no other; and the said railroads shall be and remain public highways for the use of the Government of the United

States, free from toll or other charge upon the transportation of any property or troops of the United States."

Sec. 5 provides "that the lands thereby granted to the State shall be disposed of" only in a certain manner.

*Second.* An act of the General Assembly, approved September 20, 1852.

" § 1. That all that portion of the lands granted to this State by the act of Congress entitled 'An Act granting the right of way to the State of Missouri, and a portion of the Public Lands, to aid in the construction of certain Railroads in said State,' approved June 10, 1852, so far as the same are applicable to the construction of a railroad from the town of Hannibal to the town of St. Joseph in this State, and which may be selected or located in conformity with its provisions, together with all the rights and privileges thereto belonging, or in said act granted, shall vest in full and complete title in the Hannibal and St. Joseph Railroad Company, for the uses and purposes, and subject to the conditions, reversion and provisions set forth and contained in said act of Congress."

*Third.* A copy of the resolution of the board of directors of the Hannibal and St. Joseph Railroad Company, adopted on the 7th day of March, 1853, accepting the grant of land made to the State of Missouri by the Congress of the United States to aid in the construction of certain railroads in this State, and to apply a portion thereof to the Hannibal and St. Joseph railroad, as prescribed by the 4th section of the act of September 20, 1852, and filed in the office of the Secretary of State on the 17th March, 1853, duly certified by the Secretary of State.

*Fourth.* An exemplified copy of the map of the definite location and route of the Hannibal and St. Joseph railroad from the city of Hannibal to the city of St. Joseph, Missouri, with a line on the same denoting the line of said railroad, with lines and figures on the same denoting the sections, townships and ranges—filed in the General Land Office at Washington, June 10, 1853.

" General Land Office, September 19, 1860.—I, Joseph S.

Wilson, Commissioner of the General Land Office, do hereby certify that the annexed transcript map and certificate, except the red shaded lines thereon, is a true and literal exemplification of the map on the files of this office."

*Fifth.* Evidence showing that the Hannibal and St. Joseph railroad was completed in the latter part of February, 1859, and that the land in controversy lies between three and four miles from said railroad.

*Sixth.* A list of lands certified November 18, 1854, to the Hannibal and St. Joseph Railroad Company by the Commissioner of the General Land Office, to which is prefixed the following caption:

"Hannibal and St. Joseph Railroad.—A list of vacant lands situate in the Palmyra, Milan and Plattsburgh Districts, State of Missouri, in the sections bearing even numbers, within six miles of the route of the Hannibal and St. Joseph railroad, accruing to said State in virtue of the grant made by the act of Congress approved June 10, 1852, as more particularly set forth in the general certificate hereto appended, to-wit: The N.W. ¼ of the N.W. ¼, and the E. ½ of the N.W. ¼, and the N.E. ¼ of the S.W. ¼, all in section 20, township 58, range 16.

No evidence was presented showing that the plaintiff had filed a map of the location of the road through Macon county in the office of the county recorder, as required by sec. 7 of act of September 20, 1852.

The respondent, to show title in himself, read in evidence:

*First.* The act of Congress entitled "An Act to enable the State of Arkansas and other States to reclaim the ' Swamp Lands' within their limits," approved September 28, 1850.

" Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, That to enable the State of Arkansas to construct the necessary levees and drains to reclaim the swamp and overflowed lands therein, the whole of those swamp and overflowed lands made unfit thereby for cultivation, which shall remain unsold

at the passage of this act, shall be, and the same are hereby, granted to said State.

"Sec. 2. And be it further enacted, That it shall be the duty of the Secretary of the Interior, as soon as may be practicable after the passage of this act, to make out an accurate list and plats of the lands described as aforesaid, and transmit the same to the Governor of the State of Arkansas, and, at the request of said Governor, cause a patent to be issued to the State therefor; and on that patent, the fee simple to said lands shall vest in the said State of Arkansas, subject to the disposal of the Legislature thereof: Provided, however, that the proceeds of said lands, whether from sale or by direct appropriation in kind, shall be applied exclusively, as far as necessary, to the purpose of reclaiming said lands by means of the levees and drains aforesaid.

"Sec. 3. And be it further enacted, That in making out a list and plats of the land aforesaid, all legal subdivisions, the greater part of which is "wet and unfit for cultivation," shall be included in said list and plats; but when the greater part of a subdivision is not of that character, the whole of it shall be excluded therefrom.

"Sec. 4. And be it further enacted, That the provisions of this act be extended to, and their benefits be conferred upon, each of the other States of the Union in which such swamp and overflowed lands, known and designated as aforesaid, may be situated.

"Approved, September 28, 1850."

[9 U. S. Stat. at Large, 519.]

*Second.* The 1st, 2d, 3d and 4th sections of the act of the General Assembly of the State of Missouri entitled "An Act donating certain swamp and overflowed lands to the Counties in which they lie," approved December 13, 1855, the 1st and 2d sections of which are taken fram the act of the Genneral Assembly of the State of Missouri, entitled "An Act donating certain swamp and overflowed lands to the Counties in which they lie," approved March 3, 1851.

*Third.* A certificate of purchase of the land in controversy

from the sheriff of Macon county, Mo., to Isaac Millsaps, assigned to the respondent on the 13th April, 1857.

*Fourth.* An order from the County Court of Macon county, Mo., made on the 4th May, 1852, appointing Joseph D. Butler commissioner to select the swamp and overflowed lands in said county, according to the act or acts of the Legislature donating the same.

*Fifth.* The report of said Butler, as commissioner, to the County Court of Macon county, of the lands selected by him, "that are subject to overflow and inundation during the seeding, growing and harvesting season, and have frequent standing lakes and ponds, and the Chariton meanders through, and are unfit for cultivation without embankment or artificial drainage," made on the 7th of February, 1853, and embracing the land in controversy, and an order of said County Court that said report be received.

*Sixth.* An order of said County Court, made on the 5th of September, 1855, requiring the sheriff to offer the lands selected as "swamp and overflowed" for sale to the highest bidder on the first Monday in November, 1855, except those upon which actual settlement or cultivation existed on the 1st day of September, 1855. (The respondent's assignor coming within the exception, was allowed to purchase at private sale by complying with the terms of said order.)

The respondent then offered to prove by witnesses that said land was swamp and overflowed.

The appellant objected to the introduction of any and all testimony in regard to the character of the land in controversy, as to whether it was swamp or overflowed land in 1850, and prior and subsequent thereto ; which objection was overruled, and to which the appellant excepted.

The testimony tended to show that the land in controversy lies from two-thirds to a mile on the west side of Chariton river ; that a "wet weather creek" (whose banks were higher than the adjacent land), heading in the bluffs about four miles north of said land, runs through it ; that it overflows

contiguous lands during great and sudden rains; that it falls almost as rapidly as it rises, running down in three or four hours after it ceases raining; that in dry weather it ceases to flow; that the water from the Chariton only overflowed about one-fourth of the land when there was a great flood, which appears to have occurred every few years; that 18 or 20 acres of this land had been in cultivation since 1854, producing good crops of corn and tobacco; that respondent built a dwelling-house upon it, which two scientific, pr. ctical engineers, after careful surveys and levellings, pronounced to be 12 feet above the highest rise ever known in the Chariton by the oldest inhabitant; one of whom, Mr. F. R. Lockling, had had considerable experience in surveying swamp and overflowed lands in the State of Arkansas, and who gave it as his opinion that the land in controversy was neither swamp nor overflowed land: — "The lands selected there (i. e. in Arkansas) as swamp lands were of a different character from the land in controversy; they were marshy, and water stood on them the year round; and it was necessary, in order to cultivate them, to resort to levees and drainage." That the greater portion of each legal subdivision was capable of cultivation; that said land had never been reclaimed by artificial means, such as drainage or levees; that the land has sufficient fall to carry the water off rapidly; that it does not stand upon it, nor was any of it wet except a small portion on the S.W. corner of the N.E. ¼ of N.W. ¼ during the wet season; that prior to 1850 the land had been wetter, more rain fell, more land was inundated, and Chariton river and Panther creek rose higher and spread wider than since that period.

The appellant asked the court to make the following declarations of law:

1. Under the act of Congress entitled "An Act to enable the State of Arkansas and other States to reclaim the Swamp Lands within their limits," approved September 28, 1850, the title to the land in controversy could not be divested out of

the United States until an accurate list and plat of said lands had been made out by the Secretary of the Interior and the same transmitted to the Governor of this State, and at the request of said Governor said Secretary had caused a patent to be issued to the State therefor in pursuance of the second section of the act aforesaid.

2. If the court believe from the evidence that the said land is a part of the lands granted to the State of Missouri by the act of Congress entitled "An Act granting the right of way to the State of Missouri, and a portion of the Public Lands to aid in the construction of certain Railroads in said State," approved June 10, 1852, and by the act of the Legislature of the State of Missouri, granting lands to the Hannibal and St. Joseph Railroad Company, entitled "An Act to accept a grant of land made to the State of Missouri, by an Act of the Congress of the United States, to aid in the construction of certain Railroads in this State, and to apply a portion thereof to the Hannibal and St. Joseph Railroad," approved September 20, 1852, and that the plaintiff accepted said act and all grants therein contained by a resolution of its board of directors on the 7th day of March, 1853, and that a copy of said resolution was filed in the office of the Secretary of State as prescribed by the 4th section of the last mentioned act, and that a copy of the location of the plaintiff's railroad was made and accepted by plaintiff's president and chief engineer, under the corporate seal of the plaintiff, and forwarded and filed in the office of the Commissioner of the General Land Office on the 10th day of June, 1853, as prescribed by the 1st section of the act of Congress and the 2d section of the act of the Missouri Legislature aforesaid, and that said land is within six miles of the plaintiff's railroad as located, and that said railroad was completed in 1859 ; and if the court further believe from the evidence that said several acts mentioned in this instruction had been done prior to the issuing of a patent to the State of Missouri for said lands as laid down in the first instruction, then the title to said lands is vested in the plaintiff, and the court will find for the plaintiff.

3. Under the act of Congress entitled "An Act to enable the State of Arkansas and other States to reclaim the Swamp Lands within their limits," approved September 28, 1850, the title to said land could not be divested out of the United States until evidence had been filed with the Commissioner of the General Land Office showing it to be swamp or overflowed land within the purview of said act, and a patent issued therefor, or, after the filing of said evidence, until the passage of the act of Congress of the 3d of March, 1857, confirming the title thereto in the State, without any patent; and if the court believe from the evidence that the plaintiff had complied with and performed the several acts on its part specified in the act of Congress entitled " An Act granting the right of way to the State of Missouri, and a portion of the Public Lands to aid in the construction of certain Railroads in said State," approved June 10, 1852, and of the act of the Legislature of the State of Missouri entitled " An Act to accept a grant of land made to the State of Missouri by the Congress of the United States to aid in the construction of certain Railroads in this State, and apply a portion thereof to the Hannibal and St. Joseph Railroad," approved September 20, 1852, and said land lies within six miles of the plaintiff's railroad as located, and said railroad was located prior to the institution of this suit, and prior to the issuing of said patent, or filing the evidence in the office of the Commissioner of the General Land Office as aforesaid, and prior to the passage of said act of Congress confirming the title to said land to the State, then the title thereto vested in the plaintiff, and the court will so find.

4. If the court believe from the evidence that said land is a part of the land granted to the State of Missouri by the act of Congress, as aforesaid, approved June 10, 1852, and by the act of the Legislature of the State of Missouri, as aforesaid, approved September 20, 1852, and that said land lies within six miles of plaintiff's railroad as located, and said railroad was completed prior to the institution of this suit, then the court will find for plaintiff.

5. To constitute land overflowed within the purview of the law, the same must be overflowed during the planting, cultivating and growing season, in each year, so as to be made unfit thereby for cultivation without constructing levees and drains to reclaim the same.

6. To constitute land swamp within the purview of the law, the same must be so wet and marshy during the planting, cultivating and growing season, in each year, as to be made unfit thereby for cultivation without constructing levees and drains to reclaim the same.

7. To constitute land overflowed within the purview of the law, the same must be so overflowed during the planting, cultivating and growing season, during a majority of years, as to be made unfit thereby for cultivation without constructing levees and drains to reclaim the same.

8. To constitute land swamp within the purview of the law, the same must be so wet and marshy during the planting, growing and cultivating season, in a majority of years, as to be made unfit thereby for cultivation without constructing levees and drains to reclaim the same.

9. If the court believe from the evidence that said land is neither swamp nor overflowed land as defined in instructions numbered 5 and 6, it will find for plaintiff.

10. If the court believe from the evidence that said land is neither swamp nor overflowed as defined in instructions numbered 7 and 8, it will find find for the plaintiff.

The court gave those numbered 4, 7, 8 and 10, but the remainder of said declarations it refused to make; to which refusal the appellant excepted.

The respondent then asked the court to make the following declarations of law:

1. If the lands sued for were on the 28th day of September, 1850, swamp or overflowed lands, and thereby rendered unfit for cultivation, then the act of Congress of that date was a present absolute grant thereof to the State of Missouri, and were by the act of the Legislature of 1851 conveyed to Macon County, and the plaintiff has no title thereto.

2. The State of Missouri having conveyed to Macon County the swamp lands therein, and having conveyed subsequently to the Hannibal and St. Joseph Railroad Company lands granted by Congress to the State for railroad purposes, that even though the act of Congress granting swamp lands to the State of Missouri was a conditional grant, yet the absolute grant of said lands by the State to the counties is a qualification and limitation of the grant to the railroad company, and the grant to the railroad company from Missouri was made subject to the previous grant by Missouri of the swamp lands.

3. The act of Congress granting railroad lands was made subject to the act granting swamp lands to the State, and swamp lands were not included in the grant of lands for railroad purposes.

Which the court made, and appellant excepted.

The court found and rendered judgment for the respondent.

The appellant filed a motion for a new trial; which the court overruled, and appellant excepted.

*Hall & Oliver*, for appellant.

I. The declarations of law asked by plaintiff and refused by the court should have been given. The act of Congress of September 28, 1850 (9 U. S. Stat. at Large, 519), granting the swamp and overflowed lands to the States, does not set apart any particular tracts of land and separate them from the public domain. The States might, no doubt, very properly employ agents to select said lands; but the selections, when made, did not *ipso facto* separate the land so selected from the public domain. Nothing in the act defines the officers who are charged with the duty of executing the land laws, or their control over selections made by the States in order to see that they are made by legal subdivisions; that the greater part of each tract selected is unfit for cultivation by being wet and overflowed; that they have not been sold by the United States, nor granted to railroads, nor covered

by pre-emption rights, &c. On the contrary, the act expressly imposes on the Secretary of the Interior the duty of supervising the selections, and it is only on his approval and the issuing of a patent that the final severance from the public domain of the lands so selected takes effect and the title vests in the State—Rice v. Railroad Co., 1 Black, 358; Foley v. Harrison, 15 How. 433; Baker v. Gee, 1 Wall. 336; Wilkinson v. Leland et al., 2 Pet. 661; State v. Comm'rs, 9 Wis. 236; Hann. & St. Jo. R.R. Co. v. Moore, 37 Mo. 338; Pacific R.R. v. Lindell's Heirs, 40 Mo. 359; vol. 1, part 1, Exec. Doc. 2d Sess. 32d Cong. (1852-53) p. 74; Lessieur v. Price, 12 How. 60; Gentry Co. v. Black, 32 Mo. 542; Allison v. Half-ace, 11 Iowa, 450; Mars v. Hamilton, 11 La. An. 774.

II. There never has been a selection of land in suit as swamp land. The report of commissioners of Macon County is not such a selection as is contemplated by the law.

III. The swamp act of September 28, 1850, has received a settled construction by Congress, by the General Land Office, and by the Legislature of Missouri, adverse to defendant's title—Exec. Doc. 1st Sess. 32d Cong. (1851-52), vol. 2, pt. 3, p. 18; Cong. Globe, vol. 26, pp. 613-15, and vol. 30, pp. 966-7, 988, 990; 10 U. S. Stat. 634; 11 id. 251; Laws of Mo. 1850-1, pp. 236, 238; id. 1865, p. 130.

IV. The evidence shows that plaintiff did everything required by the act of June 10, 1852 (10 U. S. Stat. 8), to give it title to the land in suit before this action was commenced. The plaintiff, therefore, has the legal title under a grant from the United States, and must prevail in this action even though it should be admitted that defendant has an equitable title—17 Mo. 31; 13 Pet. 437; id. 498; 2 How. 344; 10 U. S. Stat. 346.

*Carr*, for appellant.

The appellant makes the following points on this record:

I. The title to public land can only be divested out of the United States by patent, grant, or confirmation.

The title to the public lands being originally vested in the United States, the primary disposal of the soil was left to the discretion of Congress—Hill v. Miller, 36 Mo. 190 ; Lewis v. Lewis, 9 Mo. 183.

II. Whilst the title to public land is in the United States, it may be transferred to any person or persons, corporation, or State, and for any purpose the Government of the United States in its wisdom may deem expedient, regardless of any prior inchoate or equitable right of any other person or persons, corporation, or State.

Under the act of Congress, title to public lands can only be acquired in one of three ways.

*First.* By *patent* issued to the purchaser by the Commissioner of the General Land Office, in pursuance of some act of Congress. This is the usual and ordinary way of acquiring title from the United States.

*Second.* By *grant* contained in some act of Congress, as by the 6th section of the act of Congress of the 6th of March, 1820, providing for the admission of Missouri into the Union, whereby the sixteenth section of land in every township is " granted to the State for the use of the inhabitants of such township for the use of schools"; " all salt springs, not exceeding twelve in number, with six sections of lands adjoining to each, shall be granted to said State"; " four entire sections of land be, and the same are hereby, granted to the said State for the purpose of fixing their seat of government thereon"; that " thirty-six sections, or one entire township, which shall be designated by the President of the United States, together with the other lands heretofore reserved for that purpose, shall be reserved for the use of a seminary of learning, and vested in the Legislature of said State, to be appropriated solely for the use of such seminary by the Legislature"—3 U. S. Stat. 547.

*Third.* By *confirmation*, which is defined by Ld. Coke to be " a conveyance of an estate or right in *esse*, whereby a voidable estate is made sure and unavoidable, or where a particular estate is increased"; " a contract by which that

which was voidable is made firm and unavoidable—Bouv. Law Dic., tit. Confirmation. Numerous acts of this kind may be found in the U. S. Stat. at Large. See particularly the act of Congress of July 4, 1836 (5 U. S. Stat. 126), confirming certain Spanish claims therein mentioned. Acts of confirmation are applied to inchoate or equitable titles. If the title were good, there would be no necessity for an act of Congress confirming it. The very word imports, *ex vi termini*, that the estate or right in the land is voidable, and hence the necessity of an act of Congress to confirm it, to make it sure and unavoidable.

The respondent has totally failed to show any title to said land in any one of the three ways by which title can be acquired from the United States. It follows, then, he has no legal title. The act under which the respondent claims being prior in point of time to the act under which the appellant claims, has he thereby acquired such an inchoate or equitable title as to amount to an appropriation of said land before the passage of the act of Congress of June 10, 1852, so as to prevent the title from vesting under said act? It is affirmed that he has not. The State of Missouri is not a *bona fide* purchaser for value of said land, so as to place the Government of the United States under either a legal or moral obligation to grant or confirm it. The State neither paid, nor agreed to pay, anything for it. It was a mere bounty, which the Government of the United States could grant or withhold at pleasure. The State then is a mere volunteer, and as such not entitled to any aid from the courts. It has no claim which a court of equity would enforce. The respondent, claiming under the State, occupies no better position than the State.

So long, then, as the title to said land remained in the United States, and it had the power to grant or withhold the title at pleasure, it may be conceded that said land was swamp and overflowed on the 28th of September, 1850, and still the respondent's claim thereto is not any better. The State had no right or claim to said land only as it brought itself within the provisions of the act of September 28, 1850:

it failed to bring itself within those provisions, so as to entitle itself to the bounty thus generously offered to it, until it was too late; and it was too late after the passage of the act of the 10th June, 1852. The title of said land being in the Government of the United States at the passage of said act, passed out of it *proprio vigore* and unconditionally, by the provisions of said act, "to the State of Missouri, for the purpose of aiding in making the railroads aforesaid." It follows, then, that the title to the land in controversy was in the United States until it was divested in one of the three ways above stated—Wilcox v. Jackson, 13 Pet. 498; Grignon's Lessee v. Astor, 2 How. 319; Stoddard v. Chambers, 3 How. 285.

It has been shown that the title to swamp and overflowed lands did not pass to the State *proprio vigore* and unconditionally by the act of Congress of September 28, 1850, for want of words of present grant—Wilcox v. Jackson, 13 Pet. 498; 1 Black, 358. The converse of that proposition is true under the act of Congress of June 10, 1852, because that act uses words of present grant—Kennett v. Cole Co. Court, 13 Mo. 139; Lessieur v. Price, 12 Mo. 14; Hann. & St. Jo. R.R. Co. v. Moore, 37 Mo. 338; Lucas v. Strother, 12 Pet. 454; Ham v. State, 19 Mo. 602; S. C. 18 How. 126; Doe v. Eslava, 9 How. 446; Lessieur v. Price, 12 How. 60; Wilcox v. Jackson, 13 Pet. 498; State ex rel. Parsons v. Comm'rs, 9 Wis. 231.

III. The title to swamp and overflowed lands under the act of Congress of September 28, 1850, could only be acquired by patent prior to the act of Congress of March 3, 1857.

But the respondent may contend that the title of the State, under the act of September 28, 1850, to the land in controversy was confirmed by the act of March 3, 1857—11 U. S. Stat. 251. That act only applied to the selection of swamp and overflowed lands " heretofore made and reported to the Commissioner of the General Land Office, so far as the same shall remain vacant and unappropriated, and not interfered with by an actual settlement under existing law of the Uni-

ted States, be and the same are hereby confirmed, and shall be approved and patented to the said several States, in conformity with the provisions of the act aforesaid, as soon as may be practicable after the passage of this law." Now the respondent has not brought himself within the provisions of even this law. He adduced no evidence on the trial that the land in controversy, at the time of the passage of said act, had been selected and reported to the Commissioner of the General Land Office as swamp and overflowed land ; consequently there was no confirmation of the title to said land under that act.

No principle of law is better settled than the one where a duty is imposed by law upon a particular officer, that whatever determination he shall make in the discharge of that duty, in the absence of fraud, is final and conclusive—Hill v. Miller, 36 Mo. 182; Lewis v. Lewis, 9 Mo. 183 ; U. States v. Arredondo, 6 Pet. 729.

IV. No patent to the land in controversy was ever issued by the United States Government to the State of Missouri, as prescribed by the 2d section of the act of Congress of September 28, 1850.

V. The title to said land under said act did not pass, *proprio vigore* and unconditionally, to the State of Missouri for want of words of present grant.

VI. The title to said land was not confirmed to the State of Missouri by any act of Congress prior to the act of Congress of June 10, 1852.

VII. As the act of Congress of June 10, 1852, contained words of present grant, the title to the land described therein did pass *proprio vigore* and unconditionally to the State of Missouri.

VIII. By the adoption of the resolution of the board of directors of the Hannibal and St. Joseph Railroad Company on the 7th of March, 1853, definitely locating " the line or route" of the Hannibal and St. Joseph railroad, and filing a copy of said location in the General Land Office at Washington City ninety days after the completion of the same, the

title to every alternate section of land designated by *even* numbers, for six sections in width on each side of said road, passed *proprio vigore* and unconditionally to said company.

*Prewitt* and *Wm. A. Hall*, for respondent.

I. The act of Congress of September 28, 1850, was a present grant of swamp lands to the States in which they lie. The 2d section (authorizing the selections thereof and patents therefor) was only for the purpose of settling the fact that the lands were swamp—9 U. S. Stat. 519 ; R. C. 1855, p. 1005 ; Allison v. Half-áce, 11 Iowa, 450 ; Supervisors of Whitesides v. State's Att'y, 31 Ills. 68–75 ; Fletcher v. Pool, 20 Conn. 100 ; Hempstead v. Underhill, 20 Ark. 337 ; 20 U. S. Dig. 809, § 284; Fore v. Williams, 35 Miss. (6 George) 533 ; 20 U. S. Dig. 801, § 80, opinion of Att'y-Gen. Black ; Aubuchon v. Ames, 27 Mo. 92 ; Dunklin Co. v. Co. Ct., 23 Mo. 453 ; Lessieur v. Price, 12 How. 60–76.

II. The swamp lands and railroad lands having been by Congress both granted to the State, and the State having, before granting the railroad land to the Hannibal and St. Joseph Railroad in 1852, granted the swamp lands to the several counties in 1851, the railroad received the land granted, subject to the swamp land grant to the counties— R. C. 1855, p. 1005.

HOLMES, Judge, delivered the opinion of the court.

This was an action of ejectment to recover possession of lands situate in the county of Macon, and claimed by the plaintiff under the acts of Congress of the 10th of June, 1852, and the 3d of August, 1854 (10 U. S. Stat. § 8, p. 346), granting to the State of Missouri a portion of the publiĉ lands in aid of the construction of certain railroads, and providing for a descriptive list of the lands granted, to be certified to the State from the General Land Office ; and under an act of the General Assembly of the State, accepting the grant, and applying a portion thereof to the Hannibal and St. Joseph railroad, approved Sept. 20, 1852—Laws of 1853, p. 15.

The defendant stood upon his possession as a purchaser from the County of Macon, under a grant from the State, and relied upon an act of Congress entitled "An act to enable the State of Arkansas and other States to reclaim the swamp lands within their limits," approved September 28, 1850 (9 U. S. Stat. 519), and upon the acts of the General Assembly of the State of Missouri donating "certain swamp and overflowed lands to the counties in which they lie," approved March 3, 1851, and December 13, 1855—Laws 1851, p. 238; R. C. 1855, p. 1005.

The only evidence offered by the plaintiff to identify the specific tracts of land in controversy as a part of those which came within the operation of the act of Congress of 1852 as a grant of title for railroad purposes, was the descriptive list certified to the State by the Commissioner of the General Land Office, containing these lands, together with the map of the definite location of the railroad route. This list was made out and certified in conformity with the provisions of the act of Congress of the 3d of August, 1854, and was approved by the Secretary of the Interior, subject to any valid intervening right. The act provided as follows:

"That in all cases where lands have been or shall hereafter be granted by any law of Congress to any one of the several States and Territories, and where said law does not convey the fee simple title of such lands, or require patents to be issued therefor, the lists of such lands which have been or may hereafter be certified by the Commissioner of the General Land Office, under the seal of said office, either of originals or copies of the originals, or records, shall be regarded as conveying the fee simple of all the lands embraced in such lists that are of the character contemplated by such act of Congress and intended to be granted thereby; but when lands embraced by such lists are not of the character embraced by such acts of Congress, and are not intended to be granted thereby, said lists, so far as these lands are concerned, shall be perfectly null and void, and no right, title, or claim, or interest, shall be conveyed thereby."

That the act of Congress of 1852 was one of the acts here referred to, there is little room for doubt. It did not directly convey the fee simple to any specific and certain tracts of land; nor did it require patents to be issued. The particular sections, or parts of sections, which were to be the subjects of the grant remained to be ascertained in future. The act itself made no provision for any kind of documentary evidence, to be issued from the Land Office, by which the location, boundaries and identity of the particular tracts of land granted within the six-mile limit were to be designated and proved. The public sectional surveys, showing the even numbered sections, within the six-mile limit, on either side of the located road, though admissible evidence, have been held to be insufficient for this purpose—Baker v. Gee, 1 Wall. (U. S.) 333; Pacific R.R. v. Lindell's Heirs, 39 Mo. 329. We suppose the proper effect of this provision of the act of 1854 to be, that such lists shall be regarded as evidence of this location and identity sufficient to bring the tract of land therein contained and described within the granting words of the act of 1852, and so to convey the title in fee simple; but if the lands embraced in such lists are not of the character contemplated by the act of Congress, and are not such as were intended to be granted thereby, then the lists are to have no effect as evidence.

Now, what is meant by the character of lands contemplated and intended to be granted by such act? The provision seems to refer to the given act of Congress itself for the explanation. This act of 1852 excepted from its operation all lands sold, or subject to the right of pre-emption, or in any manner reserved; and "all lands heretofore reserved to the United States by any act of Congress, or in any other manner by competent authority, for the purpose of aiding in any object of internal improvement, or for any other purpose whatever," were thereby again expressly "reserved from the operation of this act," excepting only the right of way for such railroads. It was plainly not the intention of the act to grant any lands for railroad purposes which had been re-

served to the United States, or in any manner granted and appropriated by law to any other object of internal improvement.

Less than two years previously, Congress had passed the act of 1850 (9 U. S. Stat. 519), whereby it was enacted that " the whole of those swamp and overflowed lands made unfit thereby for cultivation, which shall remain unsold at the passage of this act, shall be and the same are hereby granted" to the States for the purpose of the reclamation of such lands in these States. The expression (*the character* of lands contemplated and intended to be granted), when applied to the act of 1852, may be taken to mean lands not sold, nor subject to pre-emption, nor reserved nor appropriated by law to aid in any object of internal improvement; and it may safely be affirmed that the first section of the prior act of 1850 amounted at least to a reservation to the United States of the swamp and overflowed lands therein mentioned. It was in terms a present grant, and was a solemn appropriation by law of all those lands to a specific object of internal improvement within the several States; and as such these lands were reserved and excepted out of the operation of the act of 1852, granting vacant and unappropriated lands for railroad purposes. It would seem to be very plain that it was not the intention of Congress to grant to the State, for railroads, the same lands which had already been granted to her for another and different object. It must follow, that if the lands in controversy were in fact of the character of swamp and overflowed lands within the purview of the act of 1850, then the certified list offered in evidence here, so far as it embraces these lands, which were not contemplated nor intended to be granted by the act of 1852, must, by the very terms of the act of 1854 itself, be held to be perfectly null and void.

The case seems to have been tried below, and has been argued here, upon the assumed theory, that the first section of the act of 1850 was a present and absolute grant, and vested title in the State at once, leaving nothing to be done in order

to show a vested title to any given tract, but to prove by evidence, even by the testimony of witnesses, that the land in question was, at the date of the act, of the character and description of swamp and overflowed land within its purview. This view of the matter cannot be sustained. The whole act must be taken together. This well settled rule of construction was applied to a somewhat similar act of Congress in the case of Rice v. Railroad Co., 1 Black, (U. S.) 358. If the first section were the whole act, there might be some room for the position assumed, however difficult it might be to ascertain by proof the particular lands which were to be the subjects of the grant. This difficulty is provided for in the act itself. The second section makes it the duty of the Secretary of the Interior to ascertain the specific tracts of land in conformity with the sectional subdivisions of the public surveys, and to make out " an accurate list and plats" thereof, and transmit the same to the Governor, and on his request " to cause a patent to be issued to the State therefor, and on that patent the fee simple to said lands shall vest in the State"; and by the third section he is to determine whether the greater part of any legal subdivision is " *of that character*," and if so to include it in the list; otherwise not. No other way of ascertaining the particular tracts, for the purpose of passing the title in fee, was contemplated by the act; and it was obviously the intent of Congress, and is the proper legal effect of the act, that there was granted, and should be conveyed by patent, the lands which should be contained in that list; and none other are to be conveyed, though it was also clearly intended that all lands of that character should be included in the list and plats. Until the particular subjects of the grant shall be thus ascertained no title can vest; the lands granted are thereby rendered certain ; and it may then be said that the legislative grant becomes complete to vest the title in fee even without a patent, the issuing of which may be considered as the act of a ministerial officer. It has been so held by the Supreme Court of Mississippi—Fore v. Williams, 35 Miss. 533. The act sup-

poses that the Governor will accept the grant of the lands so listed and platted before a patent issues. In Fore v. Williams, a list made out by the Register under the direction of the Governor, and approved by the Secretary of the Interior, was held to be a substantial compliance with this provision. The Supreme Court of Wisconsin refused a mandamus to compel the School Commissioners to issue a certificate of purchase to a pre-emptor, under the laws of the State disposing of lands granted by the same act of Congress, for the reason that no patent had been issued, and no title vested in the State; and it was said to be "quite obvious that the fee simple to the land does not vest in the State until a patent issues"—Parsons v. Comm'rs, 9 Wis. 236. We think, with the decision in *Fore v. Williams,* that it may vest when the list and plats are made out, and approved by the Secretary of the Interior, and accepted by the Governor. In some other cases, where the question arose incidentally under State statutes disposing of these lands, the language of the courts might seem to give some countenance to a different opinion —Allison v. Half-ace, 11 Iowa, 450; Whiteside Co. v. Att'y, 31 Ills. 68; Fletcher v. Pool, 20 Ark. 100. But on a close examination it is evident that the possibility of the grant operating to vest a title in fee to any particular tract, before its definite location and boundaries were thus ascertained, was not contemplated. The case of Hempstead v. Underhill, 20 Ark. 337, is more nearly in accordance with the decision in Rutherford v. Greene, 2 Wheat. 197, which was the case of a grant of 25,000 acres of land within the lands to be allotted to the officers and soldiers of the army, and the words "*shall be allotted for and are given*" were held to be a grant by force of the act, not needing any further granting act; and that *when surveyed* it became a gift of the particular lands contained in the survey; that the survey gave precision to the title, "and attached it to the land surveyed"; and that the subsequent grant by another act related back to the inception of the title. This case was further explained in Lessieur v. Price, 12 How. (U. S.) 76. We have no doubt that

it presents the correct view of the law, and we take it to be clearly to the effect, that, until the particular lands on which the act is to operate as a grant of title shall be ascertained and designated in the manner pointed out by the act itself, the grant cannot attach to any specific tracts. Until then, there is no title which can give the party a standing in court either at law or in equity. Whatever equity there may be must be considered as addressed to the political power; though there be such an inchoate equitable right as may be the subject of alienation, and constitute a basis for the operation of the doctrine of relation, whenever the title in fee shall pass out of the United States. The power to determine on what specific tracts of land the act shall operate as a grant of title, is given to the Secretary of the Interior. This is a political function, and is beyond the control of the courts— West v. Cochrane, 17 How. (U. S.) 403; Magwire v. Tyler, 1 Black, 195; Stanford v. Taylor, 18 How. (U. S.) 409; Menard v. Massey, 8 How. (U. S.) 293; Lafayette v. Kenton, 18 How. (U. S.) 59.

It appears that the States have dealt with these lands in the same way as if the act had been an absolute grant vesting a present title in fee, and the courts have recognized the right of the State to dispose of them, under its own laws, before a list was made out, or a patent issued—Mast v. Hamilton, 14 La. Ann. 775; Dunklin Co. v. District Ct., 24 Mo. 449, and cases above cited. Whatever legal ideas may have been intended in the expressions which have been used in these cases in relation to the grant and title, there would seem to be no room for question that the act amounted at least to an appropriation by law of all such lands within the several States to the specific purpose of fulfilling this grant, and made an effectual reservation of them, to be applied under the act to that purpose, and to no other, and to be listed and platted, and patented to the States for this special object of internal improvement. More express words of reservation than those employed in the act of 1852 were not needed for the purpose of making the reservation embrace these

22—VOL. XLI.

lands which had been thus specifically appropriated by the act of 1850 to fill this grant to the States. The language of Baldwin, J., in Wilcox v. Jackson, 13 Pet. 498, may find a proper application here :—"Whensoever a tract of land shall have been once legally appropriated to any purpose, from that moment the land thus appropriated becomes severed from the mass of the public lands, and no subsequent law, or proclamation, or sale, would be construed to embrace it, or to operate upon it, although no reservation were made of it." A sale of lands so appropriated or reserved, and even a patent, without further legislation to authorize it, has been held to be void—State v. Ham, 19 Mo. 602; Brown v. Clements, 3 How. (U. S.) 667.

Though the lands had been thus appropriated and granted, the political power over them was not wholly relinquished, but was to be exercised by the public officer to whom it was committed by the act itself, in good faith, and in such manner as to accomplish the object of the grant and the intent of Congress—Foley v. Harrison, 15 How. (U. S.) 433. Whenever the title in fee shall become vested in the State, it cannot be doubted that it will relate back to the date of the grant, and will vest by relation in the grantees under the State and counties; and such title would be prior and superior to any title that could be acquired under the acts of 1852 and 1854—French v. Spencer, 21 How. (U. S.) 228; Landes v. Brant, 10 How. (U. S.) 248; Ross v. Borland, 1 Pet. 664; Rutherford v. Greene, 2 Wheat. 197; Gibson v. Chouteau, 39 Mo. 588.

These particular sections and parts of sections have been embraced in the lists made out under the acts of 1852 and 1854 as a part of the grant for railroads; and if Congress had submitted the final determination of this matter to the decision of the Secretary, or Commissioner, there could be no doubt that the title shown by the plaintiff here should prevail in the action of ejectment, no vested legal title being shown by the defendant; for, though the lands were reserved, Congress still had power to dispose of them. But such is

not the case. So far as this list embraced lands which were not of the character contemplated by the act of 1852, nor intended to be granted thereby, it is by the very terms of the act of 1854 itself null and void, and can be no evidence of title.

The question remains by what kind of evidence it is to be judicially determined, whether the lands in controversy came within the purview of the act of 1850, or were not of the character of lands intended to be granted by the act of 1852. No doubt, if the Secretary of the Interior had included these lands in his list and plats of swamp and overflowed lands, his action would have been final and conclusive of that matter in the courts; but his including them in this list of railroad lands is not conclusive. It was left open by Congress to be determined on judicial investigation. The power to determine it finally was not given to any public officer. The political power over the subject was not retained by the government, but it was made a question of evidence and judicial construction, and we think it was intended to be, and was, referred to the courts.

The act of 1852 does not appear to have required any selection or listing of the lands embraced within the even numbered sections within the six-mile limit, but only of those which should be selected in lieu of them outside of that limit and within fifteen miles of the line of the railroad; but the statutes of the State did require a selection of both kinds to be made by the agents of the State, and a map of the lands selected to be recorded in each county where the land was situated; and the practice of the Land Office seems to have been to include both in the lists. No means of proving a title to the specific lands granted was provided by the act itself. The act of 1854 seems to have been intended to supply this defect. In Baker v. Gee, 1 Wall. 333, these descriptive lists were recognized as being the proper evidence to show "the lands to which the road was entitled"; the validity of the State statutes imposing burdens and conferring privileges upon the grantees of the State was admitted; and it was held

that this corporation could not recover against a defendant claiming by pre-emption under the State, without showing that a map of the lands selected and located for the railroad had been duly recorded, as required by the statute—Pacific R.R. v. Lindell's Heirs, 39 Mo. 329 ; Hann. & St. Jo. R.R. Co. v. Moore, 37 Mo. 338. No such map was offered in evidence in this case, and the question was not raised on the trial below. The plaintiff relied exclusively upon the list of the Commissioner, approved by the Secretary. Neither of these officers had any more power over the subject than was given to him by the act of Congress itself; and it is plain that these lists were not intended to be final and conclusive. It is equally plain that Congress did not intend by this act of 1854 to make any new grant of lands which had not already been granted by the act of 1852 ; and it must have been the intention of Congress that the question of the character of lands, contemplated and intended to be granted by that act, should be determined upon judicial inquiry, whenever this list should be offered in evidence in court : therefore the list must admit of rebuttal and disproof. Why may not this be done by any competent and admissible evidence ? We are not aware of any law that would require it to be done by documentary evidence only. It might be done by documentary evidence showing a prior or better title in the defendant ; but he is not put to such a defence. The inquiry is, whether these lands were of the character of swamp and overflowed lands unfit for cultivation, at the date of the act of 1850, either in the whole or in the greater part of any given sectional subdivision, and the testimony of witnesses is offered for the purpose of showing that as such they fell within the purview of that act, and were taken out of the operation of the act of 1852. This is wholly a matter of fact *in pais*. Such evidence is admissible to bring a given tract of land within the operation of a legislative grant; and it may be admitted to take it out, where no positive statute nor any rule of evidence intervenes. The determination of this matter of fact may as well be left to a jury in the one

case as in the other.   If such were in fact the character of these lands, then the Commissioner had no authority by law to include them in this list, and, though included, the list can have no effect as to them.

The reason why the same kind of evidence should not be admitted to show a title vested and complete under the first section of the act of 1850 is, that the other sections have provided a different mode of establishing title under that act, and require another kind of evidence, which is thereby made the best and the only admissible evidence for that purpose.   The case has been argued, apparently, upon the theory that this testimony was offered for the purpose of proving a title vested in the defendant.   For that purpose it was certainly not admissible; but for the purpose of rebutting and invalidating this list, produced in evidence by the plaintiff, we think it was admissible and competent.

Under the instructions which were given, the cause was submitted to the jury, and the verdict must have been rendered, substantially, upon this issue of fact.   If this fact were found for the defendant, then the plaintiff had shown no title to the lands in controversy.   He must recover on his own title or not at all; and it was immaterial whether the defendant had shown any title or not: he had a right to stand on his possession until a better title were proved.

The first instruction refused for the plaintiff contained a correct proposition of law, and might have been given if there had been any evidence before the jury on which the issue supposed in it could properly arise.   It concerned the defendant's title only, and that was immaterial.   There was, therefore, no error in refusing it of which the plaintiff can complain.

The other instructions refused for the plaintiff are sufficiently disposed of by what has been said above: they were either erroneous or immaterial.   As to the difference between the expressions "*in the majority of years*," and "*in each year*," in reference to the fitness of the lands for cultivation,

we are inclined to think the former was the more nearly correct.

The instructions which were given for the defendant, though somewhat vague, and apparently based upon legal ideas which are not very clear to us, were nevertheless substantially correct, or, at least, not so clearly erroneous, in any respect, that the plaintiff could have been seriously prejudiced. The first one made the plaintiff's right to recover depend upon the question of fact, whether these lands were of the character of swamp and overflowed lands unfit for cultivation, and, taken together with those given for the plaintiff on the same subject, placed the issue fairly enough before the jury. Whether the phrase "*a present absolute grant thereof*" meant a fee simple, or an appropriation by law, in either case the plaintiff's right to recover depended on the issue of fact which the instructions submitted to the jury. The second and third instructions would seem to have been correct enough so far as any principles of law were involved in them, and we do not see that they were materially erroneous. Their bearing upon the issue was very remote. We cannot say that the plaintiff has suffered any prejudice by their having been given.

The jury were to judge of the weight of the evidence, and, the issue having been found for the defendant, the verdict will not be disturbed.

Judgment affirmed. The other judges concur.